ARROW TRANSPORTATION CO. ET AL. *v.*
SOUTHERN RAILWAY CO. ET AL.

No. 430.   Argued January 10, 1963.—Decided April 15, 1963.

*John C. Lovett* argued the cause for petitioners. With him on the briefs was *Donald Macleay.*

*Dean Acheson* argued the cause for respondent Southern Railway Co. With him on the brief was *Francis M. Shea.*

*Ralph S. Spritzer,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Cox, Assistant Attorney General Loevinger* and *Lionel Kestenbaum.*

Briefs of *amici curiae,* urging affirmance, were filed by *Whiteford S. Blakeney* for Statesville Flour Mills; by *John W. Vardaman* for Walley Milling Company; by *Eugene Cook,* Attorney General of Georgia, *Paul Rodgers,* Assistant Attorney General, and *Walter R. McDonald* for the Southern Governors' Conference et al.; and by *Austin L. Roberts, Jr.* and *R. Everette Kreeger* for the National Association of Railroad.and Utilities Commissioners.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

A schedule of reduced rates proposed by the respondent rail carriers was suspended by the Interstate Commerce Commission for the maximum statutory period of seven months pending a determination whether the reduction was lawful. The statute [1] expressly provides that "the

---

[1] 49 U. S. C. § 15 (7):

"Whenever there shall be filed with the Commission any schedule stating a new . . . rate . . . the Commission shall have . . . authority, either upon complaint or upon its own initiative without complaint, at once . . . to enter upon a hearing concerning the lawfulness of such rate . . . and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate . . . but not for a longer period than seven months beyond the time when it

proposed change of rate . . . shall go into effect," if the Commission's proceeding has not been concluded and an order made within the period of suspension. The Commission did not reach a decision within seven months, or within the following five months during which the respondents voluntarily postponed the change, and the respondents announced that the reduced rates would be put in effect. Thereupon the petitioners[2] brought this

would otherwise go into effect; and after full hearing, whether completed before or after the rate . . . goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate . . . shall go into effect at the end of such period . . . ."

[2] The petitioners are a barge line, Arrow Transportation Co., a competitor of the respondent railroads for grain carriage; a municipality, Guntersville, Alabama, served by Arrow; a grain merchant, O. J. Walls, located in that municipality; and a grain consumer, John D. Bagwell Farms & Hatchery, Inc., which receives its grain by truck from Guntersville. The rate reductions which respondents have filed cover the shipment of grain to various points in the Southeastern United States, but apply only to multiple-car shipments from certain Mississippi and Ohio River ports. The Commission, following a complaint by competing barge lines and other parties, and on the basis of a recommendation of its Suspension Board, made a tentative finding that the proposed rates would be "unjust and unreasonable, in violation of the Interstate Commerce Act," and would "constitute unfair and destructive competitive practices in contravention of the National Transportation Policy." After the full hearing, however, Division 2 of the Commission, on January 21, 1963, concluded that Southern's rates at least were compensatory and reasonable, *Grain in Multiple-Car Shipments—River Crossings to the South*, I. & S. Docket No. 7656. That decision is now awaiting reconsideration by the full Commission.

The four petitioners have contended throughout this litigation that the application of the proposed new rail rates will irreparably injure their respective economic interests, particularly because they threaten to force Arrow out of business. Petitioners further contend that the proposed rates, being substantially lower than the competitive barge

action in the District Court for the Northern District of Alabama to enjoin the respondents from making the change effective pending the Commission's decision. The District Court concluded after examination of the pleadings and a brief hearing that "there is grave danger that irreparable injury, loss or damage may be inflicted on . . . [petitioners] if the proposed rates go into effect . . . for which . . . [petitioners] will have no adequate remedy at law." [3]   The court held, however, that § 15 (7) vested

rates in effect at the time of filing, unlawfully discriminate against a competing form of transportation. The reductions, in petitioners' view, will benefit only those users of grain who are equipped to receive very large rail shipments, to the detriment of all receivers off the rail routes, and the smaller rail-side purchasers who lack facilities for receipt and storage of multiple-car shipments. Southern responds that its reductions, at least, were made possible by technological innovations and efficiencies culminating in the inauguration of new aluminum freight cars designed especially for carriage of large grain shipments. Southern also maintains that the proposed rates are both nondiscriminatory and compensatory, and have been necessitated by vigorous competition against the railroads by unregulated motor carriers on certain routes which the barge lines do not serve.

In the course of the hearings before the Commission, the proposed rates were supported by representatives of the United States Department of Agriculture, the Southern Governors' Conference, the Southeastern Association of Railroad and Utilities Commissioners, and by various receivers and users of grain throughout the Southeast. On the other hand, the rates were protested by certain barge lines besides Arrow, several receivers of grain by barge, the Tennessee Valley Authority, flour milling interests and certain boards of trade outside the Southeast.

[3] The District Court concluded in its memorandum following an oral argument:

". . . I have convinced myself that should this Court have jurisdiction of this matter, it should consider all of these matters most carefully and deliberately before denying injunctive relief to plaintiffs. At this time I am of the opinion that the ends of justice would be best served by granting temporary injunctive relief for a limited period of time, not to urge the Commission to greater speed in deter-

exclusive power in the Commission to suspend a change of rate for a limited time and thereby precluded District Court jurisdiction to grant injunctive relief extending the statutory period. The Court of Appeals for the Fifth Circuit affirmed, stating, "Congress, in its wisdom, has fixed seven months as the maximum period of suspension. It seems clear to us that if the courts extend that period, they are in effect amending the statute and that is a matter beyond their power." 308 F. 2d 181, 186. We granted certiorari, 371 U. S. 859.[4] We affirm the judgment of the Court of Appeals.

## I.

The Interstate Commerce Commission was granted no power to suspend proposed rate changes in the original

---

mining this issue but to be sure that the parties conclude the hearings as speedily as possible. However, lacking jurisdiction, I find myself powerless to grant the relief sought; therefore, at this time it is the judgment of the Court that the motion for preliminary injunction be, and the same is hereby denied. At the same time I am denying defendants' motion to dismiss this case."

The District Court's formal order, entered the following day, denied both the petitioners' motion for a preliminary injunction and the respondents' motion to dismiss.

[4] One judge of the Court of Appeals granted petitioners' motion for a temporary restraining order on August 3, 1962, the day on which the order of the District Court issued. On August 8, however, a panel of the Court of Appeals denied petitioners' application for a restraining order pending decision of the appeal. Thereafter, but before oral argument in the Court of Appeals, MR. JUSTICE BLACK issued an order extending the Court of Appeals' restraining order pending the presentation and disposition by this Court of a petition for certiorari. The Court of Appeals rendered its opinion on September 7, 1962, and we granted certiorari on October 15. We invited the Solicitor General to file a brief expressing the views of the United States, and he filed a brief for the United States as *amicus curiae*. Southern was the only railroad which opposed certiorari or argued the merits of the case before this Court.

Act of 1887. That power first appeared among the 1910 amendments introduced by the Mann-Elkins Act.[5] The problem as to whether the application of new rates might be stayed pending decision as to their lawfulness first emerged after the Commission was empowered by the Hepburn Act of 1906 to determine the validity of proposed rates. In the absence of any suspension power in the Commission, shippers turned to the courts for injunctive relief. The results were not satisfactory. The lower federal courts evinced grave doubt whether they possessed any equity jurisdiction to grant such injunctions, and the availability of relief depended on the view of a particular court on this much controverted issue.[6] The Interstate Commerce Commission was more concerned, however, with certain practical consequences of leaving the question with the courts. In its Annual Reports for the three years before 1910 the Commission had directed attention to the fact that such courts as entertained jurisdiction were reaching diverse results, which engendered confusion and produced competitive inequities. The large expense entailed in prosecuting an action and financing a substantial bond proved prohibitive for many small shippers of modest means. Even when a large shipper secured an injunction, the scope of its relief often protected only that particular shipper, leaving his weaker

---

[5] 36 Stat. 552.

[6] The cases decided between 1906 and 1910 disclose the judicial uncertainty about the availability of any equitable relief. Compare, e. g., *Northern Pac. R. Co.* v. *Pacific Coast Lumber Mfrs. Assn.*, 165 F. 1 (C. A. 9th Cir. 1908); *Jewett Bros. & Jewett* v. *Chicago, M. & St. P. R. Co.*, 156 F. 160 (C. C. D. S. D. 1907) with, *e. g., Atlantic Coast Line R. Co.* v. *Macon Grocery Co.*, 166 F. 206 (C. A. 5th Cir. 1909), aff'd on other grounds, 215 U. S. 501; and *Wickwire Steel Co.* v. *New York Cent. & H. R. R. Co.*, 181 F. 316 (C. A. 2d Cir. 1910). See for a contemporary view that courts lacked such injunctive powers over proposed rates, 1 Drinker, The Interstate Commerce Act (1909), § 243.

competitors at the mercy of the new rate.[7] Therefore, the Commission reported to Congress, ". . . as a practical matter the small shipper who can not file the bond can not and does not continue in business under the higher rate." I. C. C. Annual Report, 1908, p. 12. As an equally serious consequence, the regulatory goal of uniformity was jeopardized by the diverse conclusions reached by different District Courts—even, it appears, as to the reasonableness of a particular rate change. This resulted in disparity of treatment as between different shippers, carriers, and sections of the country, causing in turn "discrimination and hardship to the general public." I. C. C. Annual Report, 1907, p. 10.

It cannot be said that the legislative history of the grant of the suspension power to the Commission includes unambiguous evidence of a design to extinguish whatever judicial power may have existed prior to 1910 to suspend proposed rates. However, we cannot suppose that Congress, by vesting the new suspension power in the Commission, intended to give backhanded approval to the exercise of a judicial power which had brought the whole problem to a head.

Moreover, Congress engaged in a protracted controversy concerning the period for which the Commission might suspend a change of rates. Such a controversy would have been a futile exercise unless the Congress also meant to foreclose judicial power to extend that period. This controversy spanned nearly two decades. At the outset in 1910, the proposal for conferring any such power on the Commission was strenuously opposed. The car-

---

[7] See *In re Advances in Rates—Western Case*, 20 I. C. C. 307, 313–314; Dixon, The Mann-Elkins Act, 24 Quarterly Journal of Economics, August 1910, p. 593, at 603; Crook, The Interstate Commerce Commission, 194 North American Review, December 1911, p. 858, at 867.

riers contended that any postponement of rate changes would result in loss of revenue or competitive advantages fairly due them in the interim if the rates were finally determined to be lawful. But this opposition eventually took the form of efforts to limit the time for which suspension might be ordered by the Commission.[8] The Mann-Elkins Act authorized a suspension for an initial period not to exceed 120 days with a discretionary power in the Commission to extend the period for a maximum additional six months.[9] Ten years later the Esch-Cummins Act of 1920 cut the authorized period of extension from six months to 30 days,[10] thus reducing from 10 to five months the overall period for which the Commission might order a suspension. Congress was aware throughout the consideration of these measures that some shippers might for a time have to pay unlawful rates because a proceeding might not be concluded and an order made within the reduced time.[11] To mitigate that hardship,

---

[8] The Administration originally recommended a period of 60 days; congressional proponents of suspension urged in response an unlimited suspension power, see 45 Cong. Rec. 6409. The Commission itself originally proposed a period of 120 days; the Senate Committee which reported on the Senate version of the bill recommended 90 days, S. Rep. No. 355, 61st Cong., 2d Sess. 9. For other stages of the legislative give-and-take which finally produced a period of 10 months as the maximum suspension term, see 45 Cong. Rec. 3373–3374, 3472, 4109–4110, 6500–6501, 6503, 6509, 6510–6511, 6783–6784, 6787–6788, 6900–6901, 6915–6921, 8239, 8473.

[9] 36 Stat. 552.

[10] 41 Stat. 486–487. Section 418 of the Esch-Cummins Act also added an express provision that if the hearing had not been concluded at the expiration of the 30-day extension period, "the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period . . . ."

[11] See, e. g., Statement of Commissioner Clark, Hearings on H. R. 4378 before House Committee on Interstate and Foreign Commerce, 66th Cong., 1st Sess. 91, 2944; H. R. Rep. No. 456, 66th Cong., 1st Sess. 20–21. President Taft's 1910 message expressly adverted to

the 1920 amendments authorized the Commission in such cases to require the carriers to keep detailed accounts of charges collected and to order refunds of excess charges if the Commission ultimately found the rates to be unlawful.[12] The suspension provisions took their present form, vesting authority in the Commission to suspend for a maximum period of seven months, in the Act of 1927.[13] The accounting and refund provisions of the 1920 law remained. Thus, as we have observed before, the present limitation was "formed after much experimentation with the period of suspension . . . ." *Interstate Commerce Comm'n* v. *Inland Waterways Corp.*, 319 U. S. 671, 689.

---

the possibility that the hearings might outlast the suspension period. 45 Cong. Rec. 380.

A recent summary indicates that only about three-fifths of the investigation and suspension proceedings are completed within the seven-month period, but only four percent of such cases require more than a year. Remarks of Commissioner Charles A. Webb, in Expedition of Commission Proceedings, A Panel Discussion, 27 I. C. C. Prac. J. 15, 16 (1959). Professor Sharfman is authority that at the time he wrote it was invariably the practice of carriers voluntarily to extend the period at least with respect to proposed increases. 1 Sharfman, The Interstate Commerce Commission (1931), 203.

[12] Section 418 of the Transportation Act of 1920, 41 Stat. 484, 486–487, amending § 15 of the Interstate Commerce Act.

[13] 44 Stat. 1447–1448. See S. Rep. No. 1508, 69th Cong., 2d Sess. 4. Since the enactment of § 15 (7), similar suspension provisions have been included in numerous other regulatory statutes. See 49 U. S. C. §§ 316 (g), 318 (c) (Motor Carrier Act); 49 U. S. C. § 907 (g), (i) (Water Carrier Act); 49 U. S. C. § 1006 (e) (Freight Forwarders Act); 47 U. S. C. § 204 (Federal Communications Act); 16 U. S. C. § 824d (e) (Federal Power Act); 15 U. S. C. § 717c (e) (Natural Gas Act); and 49 U. S. C. § 1482 (g) (Federal Aviation Act). The terms of these later statutes are virtually identical to those of § 15 (7), although the length of the prescribed suspension period varies. However, it should be apparent that nothing we hold with respect to § 15 (7) necessarily governs the construction and application of these other suspension provisions.

We cannot believe that Congress would have given such detailed consideration to the period of suspension unless it meant thereby to vest in the Commission the sole and exclusive power to suspend and to withdraw from the judiciary any pre-existing power to grant injunctive relief.   This Court has previously indicated its view that the present section had that effect.   In *Board of Railroad Comm'rs* v. *Great Northern R. Co.*, 281 U. S. 412, 429, Chief Justice Hughes said for the Court: "This power of suspension was entrusted to the Commission only." [14] The lower federal courts have also said as much. [15]   And

---

[14] *Great Northern* held only that the District Court lacked power to enjoin *intrastate* rates which had been duly prescribed by a state regulatory agency and which the railroads were protesting before the Interstate Commerce Commission as discriminatory against *interstate* commerce.   Although, unlike this case, the situation there involved a danger of direct conflict between federal and state regulation, see 281 U. S., at 426–430, the reasoning there does suggest the Court was of the view that even in the absence of such a direct conflict, the federal courts might not enjoin proposed rates when the Commission lacked either the inclination or the power to do so.

[15] *E. g., M. C. Kiser Co.* v. *Central of Ga. R. Co.*, 236 F. 573 (D. C. S. D. Ga.), aff'd, 239 F. 718 (C. A. 5th Cir.) ; *Freeport Sulphur Co.* v. *United States,* 199 F. Supp. 913, 916 (D. C. S. D. N. Y.) ; *Luckenbach S. S. Co.* v. *United States,* 179 F. Supp. 605, 609–610 (D. C. D. Del.), vacated in part as moot, 364 U. S. 280; cf. *Manhattan Transit Co.* v. *United States,* 24 F. Supp. 174, 177 (D. C. D. Mass.).   See also *Director General* v. *Viscose Co.,* 254 U. S. 498, 502, recognizing on similar grounds that under the Transportation Act of 1920 the District Courts lacked power to enjoin the action of the Director General of Railroads in instituting changes of commodity classifications and similar terms: "[T]here was ample and specific provision made therein for dealing with the situation through the Commission,—for suspending the supplement or rule . . . ."   254 U. S., at 502.   *Cantlay & Tanzola, Inc.,* v. *United States,* 115 F. Supp. 72 (D. C. S. D. Calif.), upon which petitioners rely, is not contrary.   There the District Court found no need to enjoin or suspend the proposed rates because, *pendente lite,* the carriers had voluntarily restored the previous schedule.   But the

the commentators on the matter have consistently supported the soundness of that view.[16]

There is, of course, a close nexus between the suspension power and the Commission's primary jurisdiction to determine the lawfulness and reasonableness of rates, a jurisdiction to which this Court had, even in 1910, already given the fullest recognition. *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426.[17] This relationship suggests it would be anomalous if a Congress which created a power of suspension in the Commission because of the dissonance engendered by recourse to the injunction nevertheless meant the judicial remedy to survive. The more plausible inference is that Congress meant to foreclose a judicial power to interfere with the *timing* of rate changes which would be out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction.

---

court said: "The Congressional intent [underlying § 15 (7)] plainly is that the courts not interfere to suspend carrier-made rates 'prior to an appropriate finding by the Interstate Commerce Commission.'" 115 F. Supp., at 83.

[16] See, *e. g.*, Professor Sharfman's view that "[u]pon failure of the Commission to issue an order within this prescribed period, the proposed changes in rates were automatically to become effective, although the Commission might continue its investigation and bring it to decision." 1 Sharfman, The Interstate Commerce Commission (1931), 202. A contemporary commentator's view of the operation of the new statute was as follows: "In other words, the Commission may suspend rates for ten months beyond their effective date but no longer, and if the investigation is not then complete, the rates automatically go into effect." Dixon, The Mann-Elkins Act, 24 Quarterly Journal of Economics, August 1910, p. 593, at 604. For a current view, see Brooks and Daily, The Commission's Power of Suspension and Judicial Review Thereof, 27 I. C. C. Prac. J. 589, 599 (1960).

[17] See also *Board of Railroad Comm'rs* v. *Great Northern R. Co.*, *supra*, at 429–430; *Director General* v. *Viscose Co.*, 254 U. S. 498, 504; *In re Advances in Rates—Western Case*, 20 I. C. C. 307, 313–314; Brooks and Daily, *supra*, note 16, at 605.

It must be admitted that Congress dealt with the problem as it affected the relations between shippers and carriers, making no express reference to the interests of competing carriers and their customers such as are involved in the instant case. We see no warrant in that omission, however, for a difference in result. Conflicts over rates between competing carriers were familiar to the Commission long before 1910; [18] indeed, the struggle between competing barge and rail carriers has been going on almost since railroads came onto the national scene. Indeed, in another provision of the very same statute Congress in 1910 dealt explicitly with the *reduction* of rates by railroads competing with water carriers: Section 4 (2) of the Act forbids a rail carrier competing with a water carrier to increase rates once reduced on a competitive service, unless "after hearing by the Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition." 49 U. S. C. § 4 (2). In addition § 8 of the Act, 49 U. S. C. § 8, creates a private right of action for damages—based upon conduct violative of the Act—which might be available, though we have no occasion here to decide the question, to a competitor claiming that a proposed rate reduction had been grossly discriminatory. Our holding today therefore means only that the injunction remedy is not available to these petitioners, just as it is unavailable to shippers.

## II.

Our conclusion from the history of the suspension power is buttressed by a consideration of the undesirable consequences which would necessarily attend the survival of the injunction remedy. A court's disposition of an application for injunctive relief would seem to require at least

---

[18] See Commissioner Eastman's description of the evolution of this competition, *Petroleum Products from New Orleans, La., Group,* 194 I. C. C. 31, 44.

some consideration of the applicant's claim that the carrier's proposed rates are unreasonable. But such consideration would create the hazard of forbidden judicial intrusion into the administrative domain.[19] Judicial cognizance of reasonableness of rates has been limited to carefully defined statutory avenues of review.[20] These considerations explain why courts consistently decline to suspend rates when the Commission has refused to do so, or to set aside an interim suspension order of the Commission.[21] If an independent appraisal of the reason-

[19] See *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co., supra,* at 440–441; *Director General* v. *Viscose Co.,* 254 U. S. 498; *Baltimore & O. R. Co.* v. *Pitcairn Coal Co.,* 215 U. S. 481, 493–495. It has been pointed out that "the agencies, through their power to suspend or deny suspension, often make final determinations of what the rates shall be during the suspension period . . . ." 1 Davis, Administrative Law (1958), 442.

[20] 28 U. S. C. § 2325 requires the convening of a three-judge District Court pursuant to 28 U. S. C. § 2284 to enjoin even temporarily the operation or execution "of any order of the Interstate Commerce Commission . . . ."

The Court of Appeals also suggested—though the suggestion has not been challenged before this Court—that § 16 of the Clayton Act, 15 U. S. C. § 26, might independently bar the injunctive relief sought here. 308 F. 2d, at 185. That section restricts to the United States, in suits for violations of the antitrust laws, the right to seek injunctive relief against any common carrier "in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission." Its applicability would, of course, depend upon whether or not the petitioners' action rests upon claimed violations of the antitrust laws. Cf. *Central Transfer Co.* v. *Terminal Railroad Assn.,* 288 U. S. 469.

[21] See, *e. g., Carlsen* v. *United States,* 107 F. Supp. 398 (D. C. S. D. N. Y.); *Bison S. S. Corp.* v. *United States,* 182 F. Supp. 63 (D. C. N. D. Ohio); *Luckenbach S. S. Co.* v. *United States,* 179 F. Supp. 605 (D. C. D. Del.). But cf. *Amarillo-Borger Express, Inc.,* v. *United States,* 138 F. Supp. 411 (D. C. N. D. Tex.), vacated as moot, 352 U. S. 1028; *Seatrain Lines, Inc.,* v. *United States,* 168 F. Supp. 819 (D. C. S. D. N. Y.). Compare generally Goodman, The History and

ableness of rates might be made for the purpose of deciding applications for injunctive relief, Congress would have failed to correct the situation so hazardous to uniformity which prompted its decision to vest the suspension power in the Commission. Moreover, such a procedure would permit a single judge to pass before final Commission action upon the question of reasonableness of a rate, which the statute expressly entrusts only to a court of three judges reviewing the Commission's completed task.[22]

Nor is the situation different in this case if it be suggested that a court of equity might rely upon the Commission's finding of unreasonableness which preceded the Commission's suspension order. The Commission's con-

---

Scope of Federal Power to Delay Changes in Transportation Rates, 27 I. C. C. Prac. J. 245 (1959), with Brooks and Daily, The Commission's Power of Suspension and Judicial Review Thereof, *id.*, 589 (1960).

[22] Thus we do not reflect in any way upon decisions which have recognized a limited judicial power to preserve the court's jurisdiction or maintain the *status quo* by injunction pending review of an agency's action through the prescribed statutory channels. Cf., *e. g.*, *Scripps-Howard Radio, Inc.*, v. *Federal Communications Comm'n*, 316 U. S. 4; *West India Fruit & S. S. Co.* v. *Seatrain Lines, Inc.*, 170 F. 2d 775; *Board of Governors* v. *Transamerica Corp.*, 184 F. 2d 311. Such power has been deemed merely incidental to the courts' jurisdiction to review final agency action, and has never been recognized in derogation of such a clear congressional purpose to oust judicial power as that manifested in the Interstate Commerce Act.

It has also been suggested that a judicial power of this sort may have survived by reason of the "saving clause" of the statute, 49 U. S. C. § 22 (1). That conclusion would, of course, follow only if prior to the adoption of the Act there had been a clearly recognized equitable power to enjoin proposed rate changes. This, as we have already indicated, was not the case. Moreover, we have generally rejected such constructions of this and similar saving clauses, see, *e. g.*, *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, *supra*; *T. I. M. E.*, *Inc.*, v. *United States*, 359 U. S. 464, 472–474.

sideration of the question, through its Suspension Board, involves only a brief and informal hearing.[23]  Automatic judicial acceptance of a finding reached in that way would delegate greater effect to such an administrative process than the process itself warrants.  As the basis for a judicial decree of a single district judge, such a procedure would be inconsistent with § 15 (1) of the Act, which provides that effective rates may be struck down as unlawful after a "full hearing" by the Commission.[24]

## III.

The petitioners contend that in any event injunctive relief is authorized in this case to enforce the National Transportation Policy.[25]  They argue that when the rail carriers' rates go into effect the barge line will inevitably

_____

[23] See *North Carolina Natural Gas Corp.* v. *United States,* 200 F. Supp. 745, 750 (D. C. D. Del.).  The Commission's regulations and rules contemplate only an informal hearing before the Suspension Board upon a protest, of which no transcript is to be made, although reconsideration may be requested.  See 49 CFR §§ 1.42, 1.200; see also 1 Davis, Administrative Law (1958), 441: "Although a hearing cannot be held on the question whether to suspend pending hearing, in many cases hurried conferences are held, which provide substantial safeguard against arbitrary action."  The practice of the Civil Aeronautics Board under a virtually identical suspension statute appears to be more formal, 14 CFR § 302.505; see *Air Freight Forwarder Assn.,* 8 C. A. B. 469, 474.

[24] We suggest no lack of congressional power to grant either administrative or judicial authority to extend a suspension period prior to completion of the administrative proceeding.  Under other statutes Congress has evinced a clear intention to vest the courts with such power.  The National Labor Relations Board, for example, has expressly been authorized to apply to the courts for "appropriate temporary relief or restraining order" pending the Board's decision of an unfair labor practice case.  29 U. S. C. § 160 (j).  Cf. *Trans-Pacific Freight Conference* v. *Federal Maritime Board,* 112 U. S. App. D. C. 290, 295, 302 F. 2d 875, 880.

[25] 54 Stat. 899, which has been inserted before Part I of the Interstate Commerce Act.

and immediately be driven out of business, contrary to the paramount concern of the policy for the protection of water carriers threatened by rail competition. Apart from the absence of any decisive showing that the barge line would suffer this misfortune, it is clear that nothing in the National Transportation Policy, enacted many years after the 1927 revision of § 15 (7), indicates that Congress intended to revive a judicial power which we have found was extinguished when the suspension power was vested in the Commission. Cf. *United States* v. *Borden Co.*, 308 U. S. 188, 198–199. Indeed, if anything, the policy reinforces our conclusion. The mandate to achieve a balance between competing forms of transportation is directed not to the courts but to the Commission.[26] It is reasonable to suppose that had Congress felt that balance to be in danger of distortion, it would have addressed itself to our problem directly by enhancing the powers granted the Commission to enforce the policy. Surely Congress would not have meant its silence alone to imply the revival of a judicial remedy the exercise of which might well defeat rather than promote the objectives of the National Transportation Policy.

*Affirmed.*

Mr. Justice Clark, with whom The Chief Justice and Mr. Justice Black join, dissenting.

The Court by its action today sounds the death knell for barge transportation on the Tennessee River. The war of extermination between the railroads and barge lines began years ago, and, as Chairman Eastman said in *Petroleum Products From New Orleans, La., Group,*

---

[26] *Schaffer Transportation Co.* v. *United States*, 355 U. S. 83, 87–88; *Arrow Transportation Co.* v. *United States*, 176 F. Supp. 411, 416 (D. C. N. D. Ala.), aff'd *per curiam sub nom. State Corporation Comm'n* v. *Arrow Transportation Co.*, 361 U. S. 353.

194 I. C. C. 31, 44 (1933), has been effected "by [the railroads] cutting rates where the [barge] competition existed, to whatever extent was necessary to paralyze it, at the same time maintaining rates at a very high level elsewhere." Indeed, this Court has on many occasions had to protect barge lines from such unlawful practices, even in cases where railroad rate activity has received approval of the Interstate Commerce Commission. See *Dixie Carriers, Inc.,* v. *United States,* 351 U. S. 56 (1956), and *Interstate Commerce Comm'n* v. *Mechling,* 330 U. S. 567 (1947). See also *Arrow Transp. Co.* v. *United States,* 176 F. Supp. 411 (D. C. N. D. Ala. 1959). And just a few months ago there was filed here in No. 746, *Mechling Barge Lines, Inc.,* v. *United States,* another case in which the appellants contend that the same old practices were employed. Although the Court admits that "It cannot be said that the legislative history . . . [of the suspension power of the Commission, § 15 (7)] includes unambiguous evidence of a design to extinguish . . . judicial power . . . ," it nevertheless strips the courts of any power to prevent (1) the collection by the railroads of "rates and charges . . . which would be unjust and unreasonable, in violation of the Interstate Commerce Act, and constitute unfair and destructive competitive practices in contravention of the National Transportation Policy . . ." as found by the Interstate Commerce Commission; [1] (2) the frustration of the National Transportation Policy under which Congress has commanded the Commission to preserve each medium of transportation

---

[1] We note that on January 21, 1963, while the case was pending here, the Division of the Commission which had previously considered the case concluded that some of the rates proposed by Southern were lawful but still found most (88%) of the entire rate package of all of the railroads unlawful. Even this finding, however, is not final, for it is subject to and is in fact pending reconsideration before the full Commission.

against unlawful and destructive practices and to guard against the consequences of discrimination; (3) the complete destruction of competing barge lines as well as gross discrimination against shippers and localities along the Tennessee River. I agree with the United States, which has filed at our suggestion an *amicus curiae* brief, that where "a competing carrier will be destroyed and others will suffer gross discrimination and injury before the administrative proceeding is terminated," the appropriate federal court does have the power to enjoin such an extraordinary injury pending decision of the Commission.

## I.

The conclusions below that the proposed rate reductions will likely force the barge line out of business are not disputed. As the District Court found, there was "grave danger that irreparable injury, loss or damage may be inflicted . . . if the proposed rates go into effect" and that petitioners "will have no adequate remedy at law." On its face the rate reduction is but a continuation of the old policy found by Chairman Eastman to paralyze barge operations—activity to which the Court now gives its blessing—by a drastic reduction in the present all-rail rate on multiple-car grain shipments while maintaining the higher rate on the ex-barge traffic. The new rate for the haul from St. Louis to Birmingham, reduced from $8.70 per ton to a mere $3.12, is an example which illustrates the effect of the proposed rate reduction. Arrow's present rate for shipments between those points is $5.48, including expense to Arrow of $2.20 for the 71-mile rail leg from Guntersville, Alabama, to Birmingham and 89¢ for transferring the grain from the barge to the rails at Guntersville, which leaves it only $2.39 for transportation by barge. In order to meet Southern's new rate Arrow would have to reduce by $2.36

its charge allocable to water travel, which would leave it exactly 3¢ per ton for that haul. I note further that the all-rail rate for the St. Louis-Birmingham haul is only 92¢ more than the charge to Arrow for the 71-mile Guntersville-Birmingham rail trip. The result of the effectuation of such drastic reductions is elementary—economic destruction of an important mode of transportation. Still the Court refuses to allow the exercise of an inherent equity power to prevent an unconscionably destructive practice which is damaging not only to Arrow, or to barge lines generally, or to water shippers or river ports, or to industries, but to the public welfare itself—all of this by inference. The Court says "that Congress meant to foreclose a judicial power to interfere with the *timing* of rate changes . . . out of harmony with the uniformity of rate *levels* . . . ." That reasoning, in the light of the fact that many of the proposed rates are less than 40% of existing ones, coupled with the findings of the Commission and the District Court as to the probable result of this drastic action, is, with due deference, entirely insupportable.

## II.

The Court seems to say that because Congress, by § 15 (7), gave the Commission the power in its discretion to suspend rates for a short period, a power which it never previously had, it *ipso facto* foreclosed the federal courts from exercising a power they had always possessed, *i. e.,* equity jurisdiction to preserve the *status quo* and prevent irreparable injury. The two powers are of an entirely different character. The suspension power granted the Commission under § 15 (7) is primary and is exercised in its discretion while the validity of a proposed rate is under consideration, but it is limited under present law to a period of seven months. No criteria or guidelines are laid down for the Commission, the only prerequisite be-

ing the filing of "a statement in writing of its reasons for such suspension." Hence the Commission has a broad, general discretion to suspend proposed rates for a limited period pending investigation. The court, on the other hand, can act only in compelling circumstances to prevent an irreparable injury and to maintain the *status quo* pending the Commission's decision—an equitable power long recognized as existing in the courts. The exercise of these judicial powers is but in aid of and ancillary to the temporary suspension power of the Commission and supports rather than interferes with the latter's jurisdiction, preventing irreparable injury from resulting while the Commission has the matter under consideration. Indeed, this power should be exercised only in the most exigent circumstances, such as in the present case, where the Commission has found a strong likelihood of irreparable injury resulting from effectuation of proposed rates, has in fact exercised the full measure of its suspension power and now finds itself powerless to prevent those rates from going into effect. I submit that neither the language of § 15 (7) nor its legislative history supports the removal of judicial power to act in such circumstances.

Prior to 1910 the Commission had the power neither to suspend proposed rates nor "to prevent by direct action excessively low rates," *Skinner & Eddy Corp.* v. *United States,* 249 U. S. 557, 566 (1919), and its earliest suspensions of proposed rate reductions occurred subsequent to 1910. See *Suspension of Rates on Packinghouse Products,* 21 I. C. C. 68 (1911); *Board of Trade of Chicago* v. *Illinois Central R. Co.,* 26 I. C. C. 545 (1913). It was not until 1920 that the Commission was given power to exercise direct action and prescribe minimum rates. Transportation Act of 1920, 41 Stat. 484, 49 U. S. C. §15 (1); see *United States* v. *Illinois Central R. Co.,* 263 U. S. 515, 525 (1924). At the time of the enactment

of § 15 (7), as the legislative history shows, there was no evident concern with rate decreases and protection of competing carriers, but attention was focused on the protection of shippers from excessive rate increases with which the Commission had ample power to deal, though it could not at that time suspend rates.[2] This omission was noted on the floor of the Senate on the day before the vote was taken on § 15 (7) when Senator Heyburn observed that "Little or no consideration seems to have been given to the advisability of including decreases in rates under the amendment." 45 Cong. Rec. 6792. There is no evidence that complaints as to rate reductions occupied any significant portion of the Commission's docket prior to 1910. Prior to that time the Commission was concerned almost exclusively with shippers' complaints of rate increases. It is hard for me to see, therefore, how it could be said that Congress, when it first enacted the suspension power in 1910, was faced with the problem of the suspension of rate decreases as between competing carriers when there had apparently been very few, if indeed any, such complaints previous to 1910. The Court says that prior to enactment of the suspension power in 1910, "such courts as entertained jurisdiction" in rate cases "were reaching diverse results" and producing "confusion and . . . competitive inequities," but those cases, as far as can be determined, did not involve unjust and destructively low rates. Therefore, while there were, as the Court points out, "[c]onflicts . . . between competing carriers" prior to 1910, there is no indication that

---

[2] In 1910 Congress enacted § 4 (2) of the Act, the provisions of which evidence an awareness that railroad rate reductions could be destructive competitive practices, see *Skinner & Eddy Corp.* v. *United States,* 249 U. S. 557, 566–567 (1919), but § 4 (2) clearly does not prohibit such practices. Not until the Transportation Act of 1920, as we have noted, was the Commission given the power to prescribe minimum rates.

any of these cases involved reductions in rates. Finally, a suspension power similar to the "judicial power" which the Court says brought "the whole problem to a head" is now, by statute, exercised by the Commission for a limited period as a matter of primary jurisdiction—a power quite different from that which the District Court was asked to exercise here. A simple grant of jurisdiction to an administrative agency without reference to a long-recognized equity jurisdiction which is not inconsistent therewith is a strange way to dispose of judicial power. See *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc.*, 371 U. S. 84 (1962). I attribute no such purblindness to Congress.

It can hardly be said that the granting of this primary jurisdiction with power to suspend for seven months totally ousted the equity courts of their traditional power to grant injunctive relief to preserve the *status quo* and prevent irreparable injury while the case is in progress in another forum. The cases do not support this conclusion where the other forum is either a court of law, *Erhardt* v. *Boaro*, 113 U. S. 537 (1885); *Louisville & N. R. Co.* v. *Western Union Telegraph Co.*, 207 F. 1 (C. A. 6th Cir. 1913), or an administrative agency. *Trans-Pacific Frgt. Conf. of Japan* v. *Federal Maritime Bd.*, 112 U. S. App. D. C. 290, 295, 302 F. 2d 875, 880 (1962); *Board of Governors* v. *Transamerica Corp.*, 184 F. 2d 311 (C. A. 9th Cir. 1950); *West India Fruit & Steamship Co.* v. *Seatrain Lines*, 170 F. 2d 775 (C. A. 2d Cir. 1948); *Isbrandtsen* v. *United States*, 81 F. Supp. 544 (D. C. S. D. N. Y. 1948). Moreover, whenever Congress wanted to oust the jurisdiction of the courts it not only knew how to do it but did so in no uncertain terms. See, *e. g.*, Internal Revenue Code of 1954, § 7421; Norris-La-Guardia Act, 29 U. S. C. §§ 101–115. In addition to these considerations, I submit that the Interstate Commerce Act itself supports the conclusion that the courts retained their traditional jurisdiction. Section 22 (1)

of the Act, 24 Stat. 387, 49 U. S. C. § 22 (1), provides that no provision of the Act shall "in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." The "remedies now existing at common law" include such equitable remedies as injunctions. *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638 (1900).

Finally, in 1940, the Congress adopted the National Transportation Policy (54 Stat. 899, 49 U. S. C. preceding § 1) in which it enjoined the Commission to

> "foster sound economic conditions in transportation and among the several carriers; . . . encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations . . . or unfair or destructive competitive practices; . . . all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States . . . . All of the provisions of [the Interstate Commerce Act] shall be administered and enforced with a view to carrying out the above declaration of policy."

The policy of "developing, coordinating, and *preserving* a national transportation system by water, highway, and rail . . . adequate to meet the needs of the commerce of the United States" (emphasis supplied) will be completely thwarted if Arrow and other barge lines on the Tennessee River are forced out of business. It is, indeed, a sad day for our judicial processes when our courts are rendered powerless to prevent this miscarriage of the clear policy of our Government, the frustration of the admitted duties of the Interstate Commerce Commission and the destruction of an entire system of transportation.

In short, this case presents a situation peculiarly appropriate for the exercise of the inherent equity jurisdiction of a federal court to supplement the now-exhausted suspension power of the Commission, consistent with the Commission's conclusion that such suspension is in the public interest and consistent with the affirmative mandate of the Congress in the National Transportation Policy.

In addition, while it would be inappropriate to discuss the constitutional questions raised as to § 15 (7), the opinion of the Court evokes grave doubt about the constitutionality of the statute, as interpreted. See *Porter* v. *Investors Syndicate,* 286 U. S. 461, 470–471 (1932); *Pacific Tel. & Tel. Co.* v. *Kuykendall,* 265 U. S. 196, 201, 204–205 (1924)

I dissent.