**UNITED STATES of America,**
**Appellant,**

v.

**SOUTHERN RAILWAY COMPANY,**
**Appellee.**

**No. 9515.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 6, 1964.

Decided Feb. 4, 1965.

Wm. Medford, U. S. Atty. (Thomas H. O'Leary, Attorney, Department of Justice, and Henry L. Hilzinger, Attorney, Interstate Commerce Commission, on brief), for appellant.

Gerhard A. Gesell, Washington, D. C. (William T. Joyner, Raleigh, N. C., Wiley F. Mitchell, Jr., W. Graham Claytor, Jr., and Ernest T. Kaufmann, Washington, D. C., on brief), for appellee.

Before HAYNSWORTH and J. SPENCER BELL, Circuit Judges, and EUGENE A. GORDON, District Judge.

HAYNSWORTH, Circuit Judge.

We are concerned with the application of the automatic coupling requirement of the Safety Appliance Act of 1893 to two hopper cars which the Southern Railway has undertaken to transform into one by securely joining them. The District Court found the Act's requirement inapplicable to the "A" ends of the united twins. It did so on motion for summary judgment. We reverse and remand, for we think some further factual inquiry essential.

In recent years, the Southern Railway has displayed, refreshingly, a capacity for innovation in the design and construction of freight cars and in rate making to produce lower rates for shippers in large volume.[1] In 1963, it sought to meet its need for hopper cars of larger volume by converting two old hopper cars into one "articulated" car. This it did by effecting a relatively permanent union of the couplers and hoses at the "A" end [2] of the cars.

Some of the parts of the automatic coupler at the "A" end of each of the two cars were removed. Removed also was the lever by which the couplers had earlier been operable from the side of the car. The two couplers were then united in a locked position. To further assure maintenance of the union, a short, heavy metal part was inserted in each coupler and its top was welded to the coupler housing. So long as that part remained in place, the coupler's parts could not be moved to an unlocked position.

The old air hoses and angle cocks were also removed. They were replaced by one length of hose without provision of means for shutting off or regulating the flow of air between the two units.

A relatively permanent union of the two old units was thus effected. Some work in a shop would be required to disengage them. A yard brakeman could not do it.

The numbers of the old cars were retired and a single number assigned the combined car. Viewed from the side, the unit on the left has painted upon it in large letters the word "SOUTHERN," while the one on the right displays in numerals of the same size as the letters the number assigned to the combination.

The Southern treats the combination as a single car. It does so in applying its shipping rates and in charging per diem rates to off-line carriers and demurrage to shippers. Switching lists carry

1. See, for instance, Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52.

2. The end of the car where the hand brake is located is the "B" end. The other is the "A" end. The "articulated" car thus had a hand brake at either end.

it as one car, and a single switching ticket is issued for it. It is inventoried as a single car, and The Southern Weighing and Inspection Bureau has approved the railroad's practice of weighing the combination as one car and computing weighing charges on that basis.

Section 2 of the Safety Appliance Act of 1893 [3] prohibits the use in interstate commerce of any car "not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." The Congress, however, did not attempt to formulate a definition of a car.

■ Under these circumstances, Southern contends it has created a single "articulated" car fully meeting the requirements of the Act since the "B" ends of the old units, the outer ends of the combination, are equipped with automatic couplers operable as required by the statute. Even if the combination is not one car within the meaning of the statute, Southern contends that the Act's requirements are inapplicable to their united ends since yard employees have no occasion to uncouple the units and could not do it if they tried.

There is such a thing as an articulated car. That term is defined in the Car Builder's Cyclopedia [4] as "[a] car consisting of two or more full size units free to swivel, the inner ends being carried on a common center truck." In such a car the center truck performs the function of couplers, but it serves other offices, too. Most importantly for our purposes, there is no opening between the units into which a mistaken brakeman might be lured. Here, in contrast, the fused couplers serve no other office than they did before their modification. Superficially, their appearance has not been changed. Though Southern has created a unified car for many of its purposes, it is neither clear nor unequivocal that it is a single car within the meaning of § 2 of the Act.

■ Whether this is one car within the meaning of the statute should be determined in the light of the apparent congressional purpose. The answer is not to be found in the fact that, for many purposes, the combination is a single car or is treated as if it were. Theoretical abstractions are of no help. Our conclusion must be founded upon practical considerations. The first question posed by Southern, therefore, is substantially resolved into its second contention.

The statute ought not to be given a construction foreign to its purpose. Mechanically applied in unrelated situations, it could be made to serve no other end than a hindrance of progress. Surely, introduction and use of better equipment and improved methods deserve encouragement rather than frustration.

That, of course, was the general intention of the Congress when it enacted the statute. Confronted with the gory statistics of what approached the slaughter of railroad men, it acted to require the use of the best and safest equipment then known.

■ The specific purpose of § 2, evident in its language as well as in its legislative history, was to minimize the necessity of having men pass between the cars. The requirement of couplers coupling automatically on impact and capable of being uncoupled from the side of the car would enable the men to avoid going between the cars except when coupling air hoses to make train brakes operable. Elimination of the need to have men go between the cars to uncouple them or to perform the basic coupling operation materially reduced the hazard which had resulted in a major portion of the deaths which had aroused the Congress.

It was recognition of the general as well as the specific intention of the Congress, and the consistency of the two, which led the Supreme Court to hold that automatic couplers were not required between the old steam locomotive and its

---

**3.** 45 USCA § 2.

**4.** Car Builder's Cyclopedia, 21st ed. p. 9.

tender.[5] In holding that the case was not "within the mischief or the remedy of the act," the Supreme Court pointed out that "there was practically no opening between the engine and tender" and that the pin which held the engine's drawbar in the tender's yoke was placed in position by a man standing on the tender's tank and not exposed to the danger which prompted the enactment of § 2.

Applying these principles, then District Judge Joseph C. Hutcheson, Jr. held that § 2 did not apply to two flat cars chained together for the purpose of accommodating a twin load, even when the cars after unloading were being returned to their point of origin.[6] While the Court emphasized the fact that the two flat cars were not intended to be uncoupled and recoupled while in ordinary use and could not be uncoupled outside a repair shop, it is evident that the twin load would give adequate warning to every trainman that he was not to attempt to uncouple them. The chains may have given similar warning after the cars were unloaded.

Here the two units of the combination are not intended to be uncoupled, and they cannot be outside a repair shop. The present record, however, does not justify summary dismissal of the Government's suggestion that switchmen and brakemen may not be expected always to recognize those facts. In the absence of chains or other connecting material running between the ends near the sides of the units, there well may be substantial risk that in darkness or bad weather, an uninformed brakeman might count one of the combination's units as one car, or, being otherwise confused, attempt their uncoupling. If one should make such an attempt and in darkness futilely grope for the absent uncoupling lever or the air cock, we can have no assurance he would not enter the space between the units to discover the difficulty.

■ While the statute should not be applied when its application has no relation to its purpose, absence of any reasonable relationship must be plain. The statute's command cannot be ignored though an individual judge may be unsympathetic with it in a particular context. Promotion of safety and a reduction in the number of deaths was a salutary purpose requiring a liberal construction of the congressional choice of specific remedies whenever liberal construction will further that purpose.

■ Complete elimination of the need for uncoupling cars may be said to be safer by far than providing the safest, practical means for uncoupling and coupling them. That is clearly so, however, only if there is adequate warning that the particular units are not to be uncoupled. So long as there is substantial likelihood that railroad men will be confused and misled into entry between the cars with resulting risk of lives and limbs, the statute's application cannot be said to be foreign to its purpose.

Our difficulty would be avoided if the units were equipped with devices which would clearly give the warning the present physical arrangement now may lack.

It is not inconceivable that the railroad could show that the physical changes it has wrought shout more loudly than we are now permitted to suppose a warning that no one is to attempt to uncouple the cars. It is even possible that the warning has been spread by other means. There are a number of these combined units in service, and the risk that an uninitiated trainman might be enticed between them conceivably could appear in a different light after an evidentiary hearing.

■ On this record, however, we cannot say that such risk is nonexistent or even insubstantial. Because there has been no showing to support such a con-

5. Pennell v. Philadelphia & Reading Railway Company, 231 U.S. 675, 34 S.Ct. 220, 58 L.Ed. 430.

6. United States v. International-Great Northern R. Co., S.D.Texas, 9 F.2d 142.

clusion, we think entry of summary judgment for the railroad was unwarranted.

Reversed and remanded.