SAN ANTONIO, TEXAS, Acting By and Through Its PUBLIC SERVICE BOARD, Plaintiff-Appellee,

v.

BURLINGTON NORTHERN, INC., the Colorado and Southern Railway Company, Fort Worth and Denver Railway Company, and Southern Pacific Transportation Company, Defendants-Appellants.

SAN ANTONIO, TEXAS, Acting By and Through Its PUBLIC SERVICE BOARD, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

Nos. 81–1150, 81–4141.

United States Court of Appeals,
Fifth Circuit.

Unit A

June 19, 1981.

Thomas W. Merrill, Chicago, Ill., R. Eden Martin, Washington, D.C., Alan R. Post, Asst. Gen. Sol., Burlington Northern, St. Paul Minn., Stuart E. Vaughn, San Francisco, Cal., for defendants-appellants.

Slover & Loftus, William L. Slover, C. Michael Loftus, Washington, D.C., J. David Forsyth, Cicero C. Sessions, New Orleans, La., for plaintiff-appellee.

Stuart Fryer, Asst. Atty. Gen., Austin, Tex., for intervenor, State of Tex.

Timm Abendroth, I.C.C., Kenneth P. Kolson, John J. Powers, III, Dept. of Justice, Washington, D.C., for respondents.

Before BROWN, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

This appeal presents the question whether the District Court for the Western District of Texas, San Antonio Division, had jurisdiction to order a preliminary injunction,[1] enjoining appellant-railroads from putting into effect a tariff rate published with the Interstate Commerce Commission. We hold that it did not. In conjunction with this holding, we deny petitioner's motion to stay the Commission's order reported at *San Antonio, Texas v. Burlington Northern, Inc.*, I.C.C. Dkt. No. 36180 (April 7, 1981), which vacated an earlier rate determination by the Commission in *San Antonio, Texas v. Burlington Northern, Inc.*, 355 I.C.C. 405 (1976) (*San Antonio I*).

We previously considered various motions, granting the railroads' motions to stay the preliminary injunction pending appeal and to expedite the appeal, denying the railroads' motion to vacate the preliminary injunction instanter, and ordering carried with the case San Antonio's motion to stay the April 7, 1981 order of the Commission vacating its decision in *San Antonio I*. In extended oral argument and in exhaustive briefs, the parties fully addressed all aspects of the merits of this appeal. Appellate jurisdiction is based on 28 U.S.C. § 1292(a)(1).

---

1. The preliminary injunction, which was entered on March 20, 1981, prohibited the railroads from conditioning rail service upon prepayment of charges or payment of any rate other than that prescribed by the Commission in *San Antonio I*, as modified by applicable general and inflationary rate increases.

## BACKGROUND

This appeal constitutes but one of several litigational chapters in the orogenic dispute between San Antonio, Texas on one side, and Burlington Northern, Inc., and its subsidiaries, and Southern Pacific Transportation Company (the railroads) on the other. At the crux of the controversy is the determination by the Interstate Commerce Commission of a maximum reasonable rate for unit-train shipments of coal from Campbell County, Wyoming to Elmendorf, Texas, a suburb of San Antonio and location of San Antonio's electric generating station.

During the early 1970s market conditions compelled San Antonio, acting through its City Public Service Board (CPSB), to change its primary electric utility fuel from natural gas to coal. In July 1973, during the course of negotiations, the railroads quoted the CPSB a proposed rate of $7.90 per ton for rail service from Wyoming to Texas, subject to annual adjustments for cost changes. On May 2, 1974, the quotation was revised to $11.09. Shortly thereafter, the CPSB entered into twenty-year contracts with two companies for the supply of coal from Wyoming, and committed itself to build two generating plants at Elmendorf.

Dissatisfied with the proposed $11.09 rate, on May 6, 1975, the CPSB filed a complaint with the Commission alleging the rate was unlawful under § 1(5) of the Interstate Commerce Act and requesting the Commission to prescribe a maximum just and reasonable rate. Because of the pressing need to eliminate delay in the transportation of the coal, the Commission moved expeditiously to resolve the dispute, found the railroads' rate unjust and unreasonable and prescribed a maximum reasonable rate of $10.93 per ton. *San Antonio I, supra.* Realizing that its order was an interim measure, however, the Commission stated that "as actual experience is gained," the parties might petition for modification of the prescribed rate. This decision and order was appealed to the Eighth Circuit, which affirmed the Commission's action. *Burlington Northern, Inc. v. United States,* 555 F.2d 637 (8th Cir. 1977).

In 1978 the Commission was asked to reopen its *San Antonio I* proceeding. After the taking of additional evidence, the Commission allowed the railroads to establish a rate not exceeding $16.12 per ton. *San Antonio, Texas v. Burlington Northern, Inc.,* 359 I.C.C. 1 (1978) (*San Antonio II*). The CPSB and the railroads both filed administrative appeals; the Commission reopened proceedings and found that a rate of $17.23 constituted a maximum reasonable rate. *San Antonio, Texas v. Burlington Northern, Inc.,* 361 I.C.C. 482 (1979) (*San Antonio III*).

Petitions for review were filed in the Court of Appeals for the District of Columbia Circuit with the railroads contending the rate ceilings imposed in *San Antonio II* and *San Antonio III* were arbitrarily low, and the CPSB contending the rate ceilings were too high. In a decision rendered June 9, 1980, the D.C. Circuit held that the bases for the challenged rate ceilings were not supported by reasoned analysis and therefore violated the requirements of the Administrative Procedure Act. The court vacated the *San Antonio II* and *III* orders and remanded to the Commission for further proceedings. *San Antonio, Texas v. United States,* 631 F.2d 831 (D.C.Cir.1980).

Citing the D.C. Circuit's vacation of *San Antonio II* and *III,* the CPSB, since approximately August 11, 1980, has refused to pay any amount over the $15.83 adjusted rate ceiling allowed by *San Antonio I.* The railroads, on the other hand, have continued to charge the rate set forth in the tariff filed with the Commission ($21.95 per ton as of August 11, 1980), which rate was within the permissive ceiling approved in *San Antonio III.* Thus the present impasse. In an effort to collect the higher rate, the railroads filed a tariff supplement (which was to become effective November 16, 1980) conditioning rail service on prepayment. On November 14, 1980, the Commission suspended the railroads' prepay tariff supplement, stating that because the D.C. Circuit had set aside the Commission's decisions in *San Antonio II* and *III,* the Commission was

then of the opinion that the only rate the railroads could charge was the adjusted rate as prescribed in *San Antonio I*. I & S Dkt. No. 9253, *Prepayment of Rates—San Antonio Coal Movements*.

Confronted with the Commission's interpretation that the D.C. Circuit's decision reinstated the *San Antonio I* rate prescription, the railroads filed a Petition for Clarification of Mandate with the D.C. Circuit urging the court to make clear that its decision did not suspend the effectiveness of the $23.05 published tariff rate or require a "rate roll-back" to the *San Antonio I* level pending proceedings on remand before the Commission. That inquiry remains pending before the D.C. Circuit.

On November 26, 1980, the railroads filed with the Commission a tariff supplement setting forth a proposed rate of $23.05 per ton for transporting coal in unit-train service from Wyoming to Elmendorf. This rate was the maximum rate level approved by the Commission in *San Antonio III* as escalated by subsequent general rate increases. Notwithstanding protest by the CPSB, the Commission on December 30, 1980, unanimously voted not to suspend or reject the proposed tariff. The six Commissioners were equally divided on the question whether to investigate the lawfulness of the rate under 49 U.S.C. § 10707. This rate became effective December 31, 1980. The CPSB did not challenge the $23.05 rate before the Commission, as it was entitled to do under the Interstate Commerce Act, 49 U.S.C. § 11701. Instead, a complaint was filed in district court on January 13, 1981, asking for enforcement of the 1976 *San Antonio I* rate prescription.

In response to the CPSB's insistence on paying the *San Antonio I* rate level of $15.83 per ton, and not the $23.05 tariff rate then on file with the Commission, the railroads filed a second prepay tariff supplement on March 5, 1981. On March 18, 1981, the Commission voted unanimously not to reject or suspend the proposed prepay tariff. In the meantime, however, on March 16, 1981, the CPSB filed motions in district court seeking a temporary restraining order

and a preliminary injunction. The TRO was entered on March 17; the preliminary injunction, enjoining the railroads from conditioning service upon the prepayment of charges or upon payment of a rate which does not conform to the *San Antonio I* rate level "until such time as the Interstate Commerce Commission enters a final, appealable Order based on the [railroads'] request for a tariff increase and for prepayment," was entered three days later. It is that injunction we review.

In an effort to assuage any doubt as to the present status of its *San Antonio I* order, the Commission on April 7, 1981, formally vacated the *San Antonio I* prescription to the extent it remained viable after the D.C. Circuit's decision. *San Antonio, Texas v. Burlington Northern, Inc.*, I.C.C. Dkt. No. 36180 (1981). Realizing the inconsistency between this position and that taken by the Commission on November 14, 1980, in I & S Dkt. No. 9253, *Prepayment of Rates—San Antonio Coal Movements*, the Commission stated:

> [A]lthough we joined the railroads in urging the [D.C. Circuit] to clarify its mandate as not restoring the *San Antonio I* rate, we nevertheless took the legal position that the result was a necessary implication of the court's vacating *San Antonio II* and *III*. Upon further consideration, we now believe our prior analysis to have been mistaken.

I.C.C. Dkt. No. 36180, *supra* at 5 n.3. In vacating *San Antonio I*, the Commission specifically stated that it was not attempting to define the legal effect of the D.C. Circuit's decision. Rather, it took the position that if the *San Antonio I* prescription was reinstated as a result of the D.C. Circuit's vacating of *San Antonio II* and *III*, then the Commission was, as a prospective matter, formally lifting the *San Antonio I* prescription until a final decision was reached in the remand proceeding.

### THE MERITS

█ The Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.*, provides that railroads must publish proposed rate changes with the Commission at least 30 days before

the new rates are to become effective. 49 U.S.C. § 10762. The Commission has primary jurisdiction to determine the lawfulness and reasonableness of railroad rates. 49 U.S.C. §§ 10701 *et seq.; Arrow Transp. Co. v. Southern R. Co.,* 372 U.S. 658, 668, 83 S.Ct. 984, 989, 10 L.Ed.2d 52 (1963). The Commission also has the power to suspend the implementation of proposed rates if it appears likely that the rates may be unlawful or harmful, or the Commission may decline to suspend the proposed rates, permitting the rates to take effect automatically. 49 U.S.C. § 10707. In either case, the Commission has the authority to conduct an investigation to determine the lawfulness of the rates, and eventually to cancel them if deemed to be unlawful. 49 U.S.C. § 10708.

■ It is apparent that Congress entrusted special authority in the Commission to determine questions of railroad ratemaking. Consequently, the threshold and decisive issue in the case at bar is jurisdictional. Does the district court have jurisdiction to enjoin the railroads from putting into effect the published rate when the Commission has determined to allow that rate to take effect pending reconsideration of its rulings on remand from the D.C. Circuit?

Resolution of the jurisdictional issue is directed by Supreme Court precedents which have consistently and unequivocally maintained that Congress conferred upon the Commission "the sole and exclusive power to suspend" published tariffs, and that Congress "meant thereby . . . to withdraw from the judiciary any preexisting power to grant injunctive relief." *Arrow,* 372 U.S. at 667, 83 S.Ct. at 988. In *Arrow,* the Court held that a district court could not delay the effectiveness of new rail carrier rates once the maximum statutory suspension period expired, because that would upset the balance between the interests of the carriers and those of the public, which Congress meant to strike by limiting the Commission's suspension power.

Ten years later the Supreme Court amplified the *Arrow* decision in *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In *SCRAP* the Court held that the judiciary cannot enjoin the effectiveness of railroad-initiated transportation surcharges for alleged violations of the National Environmental Policy Act after the Commission has acted and declined to suspend the surcharges.

More recently, the Supreme Court reiterated the principles of *Arrow* and *SCRAP* in *Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). Once again the Court observed that it is "absolutely clear" that Congress intended to commit the rate suspension power to the "unfettered discretion" of the Commission. *Id.* at 460 n.14, 99 S.Ct. at 2397 n.14. *See also Consolidated Rail Corp. v. Nat. Ass'n of Recycling Ind.,* —— U.S. ——, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981).

The clear thrust of the *Arrow-SCRAP* line of authorities makes apparent that the district court in the case at bar had no jurisdiction to enjoin the $23.05 published rate from taking effect after the Commission unanimously voted not to suspend or reject that tariff. Seeking to avoid this ineluctable conclusion, the district court reasons that the above cited cases are inapposite because the court was merely exercising its jurisdiction under 49 U.S.C. § 11705(a) to "enforce an order" of the Commission, *i. e.,* the allegedly revived 1976 *San Antonio I* rate prescription. We disagree and are compelled to the conclusion that there is no jurisdiction in the district court to enjoin the tariff at issue.

When the Commission has not made a final determination, in a matter of which it has jurisdiction, that a published rate is unlawful (whether because the rate violates a prior Commission order or for any other reason), only the Commission can suspend the rate.[2] It is clear in this case that the Commission has not made a final determination that the published rate of $23.05 per ton is unlawful. To the contrary, the Commission's decision not to suspend or reject the $23.05 per ton rate indicates a prelimi-

---

2. In *Midwest Packers Traffic Ass'n v. I.C.C.,* 579 F.2d 473, 474 (8th Cir. 1978), the carrier

filed a new tariff implementing a change in procedure for unloading meat, which would

nary determination, at least, that the rate is not unlawful.

We find no merit in the CPSB's contention that the Commission committed error by not issuing a formal order setting aside or modifying the allegedly revived *San Antonio I* rate prescription before permitting the $23.05 tariff rate to take effect. Whether or not such a formal order was required by the Commission, it is clear that an allegation of violation of the procedures prescribed by the Interstate Commerce Act does not suffice to overcome the "clear congressional purpose to oust judicial power." *SCRAP*, 412 U.S. at 695, 93 S.Ct. at 2420.

The CPSB's motion to stay the April 7, 1981 order of the Commission vacating *San Antonio I* is DENIED. Finding the district court to be without jurisdiction to enter the preliminary injunction, we order the injunction VACATED.

directly affect the rate level. The shippers contested the tariff on the ground that it was inconsistent with a prior order of the Commission. In dismissing the petition for review of the Commission's order, the court stated:

> Consistent with *Arrow* . . . and *SCRAP* . . . we hold this Court is without jurisdiction to review the Commission's failure to suspend the new rates or to enter injunctive relief.

Inasmuch as the Interstate Commerce Commission's Order instituted an investigation into the legality of the new tariff, this Court is without jurisdiction to entertain the petition for review pending final determination by the Interstate Commerce Commission of the lawfulness of the tariff.