451 F.2d 783
 3 ERC 1691, 2 Envtl. L. Rep. 20,105
 The PORT OF NEW YORK AUTHORITY, Plaintiff-Appellant,
v.
UNITED STATES of America and Interstate Commerce Commission,
Defendants-Appellees.
The CITY OF NEW YORK, Plaintiff-Appellant,
v.
UNITED STATES of America and Interstate Commerce Commission,
Defendants-Appellees.
Penn Central Transportation Company (Baker, Bond, Langdon
and Wirtz, Trustees), Intervenor in Support of The
Interstate Commerce Commission,
and
State of New York, Applicant for Intervention.
 Nos. 196, 197, Dockets 71-1769, 71-1770.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 17, 1971.
Decided Nov. 9, 1971.
 
 Arthur L. Winn, Jr., Washington, D.C., (Sidney Goldstein, New York City, of counsel), for appellant The Port of New York Authority.
 Martin S. Snitow, Asst. Corp. Counsel of The City of New York, New York City (J. Lee Rankin, Corp. Counsel, and Norman Redlich and Sheila A. Mahony, Asst. Corp. Counsel, New York City, of counsel), for appellant The City of New York.
 Geraldine R. Keyes, Atty., I. C. C., Washington, D. C. (Fritz R. Kahn, Gen. Counsel, I. C. C., Washington, D. C., Richard W. McLaren, Asst. Atty. Gen., and John H. D. Wigger, Atty., U. S. Dept. of Justice, Washington, D. C., Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, of counsel), for appellees United States and I. C. C.
 John A. Daily, New York City (Jerome H. Shapiro, New York City of counsel), for intervenor in support of the I. C. C.
 Thomas F. Harrison, Asst. Atty. Gen. of N. Y., New York City (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., and Philip Weinberg, Asst. Atty. Gen., New York City, of counsel), for applicant for intervention State of New York.
 Before MOORE, SMITH and HAYS, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 The Port of New York Authority (Port Authority) and the City of New York (City) appeal from an order of the United States District Court for the Southern District of New York that denied their request for a temporary restraining order, dismissed their complaint, and refused to convene a threejudge district court.[1] The object of the appellants' complaint is an order of the Interstate Commerce Commission (Commission), dated June 28, 1971, which permitted intervenor Penn Central Transportation Company (Penn Central) to publish tariffs effecting interim additional charges for lighterage service[2] at New York Harbor.[3]
 
 
 2
 The district court based its decision on several grounds: that it lacked subject matter jurisdiction over the action, that the appellants lacked standing to sue, that there appeared to be little likelihood of success on the merits, and that the case was not yet ripe for judicial determination. We affirm on the basis of the first stated ground, and therefore need not and do not express any opinion on the soundness of the district court's other bases for its decision.[4]
 
 History of the Penn Central Tariff
 
 3
 This case had its inception when Penn Central filed with the Commission tariff schedules setting forth additional charges for lighterage service at New York Harbor.[5] The additional charges were published to become effective on May 29, 1971. Following protests by appellants and others to the increased rates, the Board of Suspension, an employee board created by the Commission, suspended the effective date of the tariffs for the statutory period of seven months and instituted an investigation into the lawfulness of the proposed rates.[6]
 
 
 4
 Penn Central then filed a petition for reconsideration and vacation of the suspension order with an appellate division of the Commission.[7] On June 28, 1971, this division denied the petition, but authorized Penn Central to publish tariffs containing additional lighterage charges not to exceed 50% of those initially proposed.[8] Further, this order directed Penn Central to maintain an account from which payments could be refunded to the extent that the proposed tariffs were not justified before the Commission.
 
 
 5
 Appellants then filed with the Commission a petition to reconsider the June 28th order.[9] Pending consideration of this petition, the Commission stayed the June 28th order.[10] On July 28, 1971, the Commission denied the petition for reconsideration.[11] This suit followed.
 
 Jurisdiction Over Suspension Orders
 
 6
 Appellants concede that the initial decision of whether to suspend the effective date of proposed tariffs is within the sole discretion of the Commission.[12] However, they contend that once the Suspension Board decides to suspend the effective date of proposed tariffs, the Commission in its appellate capacity cannot arbitrarily reverse this decision.[13] The apparent theory underlying this contention is that it is a violation of due process for the Commission to reverse without deliberation a decision of its Suspension Board that is reached after careful deliberation.
 
 
 7
 We reject appellants' contention. First, appellants exaggerate the care with which the Suspension Board approaches its task and the carelessness with which the appellate division approaches its task. The purpose of suspension proceedings is to determine whether it would be in the interests of the public to suspend the effective date of proposed rates pending an investigation into the lawfulness of such rates.[14] The proceedings are informal.[15] No "findings" of fact in the judicial sense of the term are made. A transcript of the proceedings is not taken. Subpoenas cannot be issued. The petitions and replies are generally not verified under oath. That suspension orders through time contain the same wording further belies the validity of the contention that these proceedings are deliberate.[16] Finally, the appellate division, contrary to appellants' contention, did in the instant case give a reason for its modification of the original suspension order.[17]
 
 
 8
 More importantly, appellants' contention must fail on logical and legal grounds. First, it makes little sense to argue that the decisions of the Commission in its appellate capacity should be subject to judicial review after conceding that the decisions of the Commission's Suspension Board are not subject to judicial review.[18] The reasons for insulating the decision to suspend the effective date of proposed tariffs from judicial scrutiny in the first instance apply with equal force to the appellate decision. First, to permit judicial review of appellate decisions would invite the competitive inequities and the diversity among court decisions that initially prompted Congress to insulate the suspension decision from judicial review.[19] Second, permitting the courts to review appellate decisions would encourage that very interference with the orderly review of tariff proposals that the doctrine of primary jurisdiction is intended to preclude.[20]
 
 
 9
 Prior to the Supreme Court's decision in Arrow Transportation Co. v. Southern Railway Co., there was a conflict among three-judge district courts on the question of whether Commission orders vacating suspension orders are judicially reviewable.[21] We believe that Arrow has resolved this conflict in favor of those courts holding no review.[22] While it is true that the holding of Arrow does not directly control the issue here,[23] the opinion in the case clearly indicates that courts are not to interfere with suspension proceedings:
 
 
 10
 We cannot believe that Congress would have given such detailed consideration to the period of suspension [the consideration manifested in the legislative history of the Commission's suspension powers] unless it meant thereby to vest in the Commission the sole and exclusive power to suspend and to withdraw from the judiciary any pre-existing power to grant injunctive relief. This Court has previously indicated its view that the present section had that effect. In Board of Railroad Comm'rs of State of North Dakota v. Great Northern R. Co., 281 U.S. 412, 429, 50 S.Ct. 391, 74 L.Ed. 936, Chief Justice Hughes said for the Court: "This power of suspension was entrusted to the Commission only." The lower federal courts have said as much. And the commentators on the matter have consistently supported the soundness of that view.[24]
 
 
 11
 The basis of the decision in Arrow-that to permit judicial interference with the Commission's suspension procedures would invite the very disruption in the orderly review of the lawfulness of proposed tariffs that Congress meant to preclude-applies with equal force to the issue now before us.
 
 The June 28th Order and NEPA
 
 12
 The City argues that the failure of the Commission to accompany its June 28th order with an environmental impact statement violates section 102(2) (C) of the National Environmental Policy Act of 1969 (NEPA).[25] The City contends that the increased lighterage tariffs will cause the diversion of a substantial amount of traffic from barges and scows to trucks, and that the iscreased use of trucks will substantially worsen the already poor quality of New York's air. The City thus asks for a stay of the order permitting Penn Central to effect interim increases in lighterage tariffs until an environmental impact statement is prepared.
 
 
 13
 We disagree with the City. To grant its request would defeat the very purpose of NEPA. The Act itself, the legislative history of the Act, the President's Executive Order implementing the Act, the guidelines for federal agencies issued by the Council on Environmental Quality, the courts that have interpreted the Act, and commentators clearly establish that NEPA requires a careful evaluation by federal agencies of the nonenvironmental benefits and environmental costs of their actions.[26] As the court said in the recent Calvert Cliffs'[27] case:
 
 
 14
 NEPA mandates a case-by-case balancing judgment on the part of federal agencies. In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs; alternatives must be considered which would affect the balance of values. * * * The magnitude of possible benefits and possible costs may lie anywhere on a broad spectrum. Much will depend on the particular magnitudes involved in particular cases. In some cases, the benefits will be great enough to justify a certain quantum of environmental costs; in other cases, they will not be so great and the proposed action may have to be abandoned or significantly altered so as to bring the benefits and costs into a proper balance. The point of the individualized balancing analysis is to ensure that, with possible alterations, the optimally beneficial action is finally taken.[28]
 
 
 15
 The detailed evaluation of benefits and costs required by NEPA is not possible at the stage of the review of the lawfulness of proposed tariffs under focus here. As described above, suspension proceedings are informal, intended to determine only whether the effective date of proposed tariffs should be suspended pending a full investigation of the lawfulness of the proposals. They are simply not amenable to the careful balancing analysis mandated by NEPA. It would, therefore, frustrate the purpose of the Act to require the Commission at this stage in its review processes to determine the environmental impact of the proposed tariffs.
 
 
 16
 One might argue that a simple solution to the problem caused by the constraint of time is to require the Commission to preserve the status quo pending the preparation of an environmental impact statement. In the instant case this would mean staying Penn Central's proposed tariffs. But such a solution is too simple. It overlooks the fact that preserving the status quo can be as detrimental to the environment as permitting changes in the status quo. Just as cities can argue that increases in tariffs cause the diversion of traffic to trucks, thereby increasing air pollution, so railroads can argue that losses incurred on one line must be made up on another either in the form of increased tariffs or decreased quality of service, which in turn discourage the use of this other line, thereby diverting traffic to trucks (or, in the case of passenger lines, to automobiles), which diversion in turn causes an increase in air pollution.[29]
 
 
 17
 *****
 
 
 18
 * * *
 
 
 19
 *****
 
 
 20
 * * *
 
 
 21
 The proper forum for the City to present its contentions on the environmental impact of the increased lighterage tariffs is the commission in the investigation now being conducted into the lawfulness of these tariffs.[30] There the Commission can hear evidence on the environmental costs of the proposed tariffs, and make the careful balancing analysis that NEPA requires.
 
 
 22
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Docket No. 71-3427 (S.D.N.Y. Aug. 3, 1971). Plaintiffs alleged federal jurisdiction on the basis of sections 1336, 1398, and 2324 of Title 28
 A single district judge may dismiss a petition for a three-judge court for want of jurisdiction. American Commuters Ass'n v. Levitt, 405 F.2d 1148, 1150 (2d Cir. 1969). Review of such a decision lies with this court, not the Supreme Court. Mengelkoch v. Industrial Welfare Comm'n, 393 U.S. 83, 89 S.Ct. 60, 21 L.Ed.2d 215 (1968) (per curiam); Schackman v. Arnebergh, 387 U.S. 427, 87 S.Ct. 1622, 18 L.Ed.2d 865 (1967) (per curiam).
 
 
 [2]
 "Lighterage service consists of loading and unloading freight in barges and scows, and transporting it within New York harbor between steampship piers and the railroad's facilities. Lighterage operations permit a railroad to extend its line beyond the railheads to virtually all parts of the harbor. In addition to using barges and scows, railroads are normally permitted under present tariffs to use trucking in lieu of lighterage to transport freight between shipping piers and railroad facilities." Affidavit of D. Kenneth Patton, Administrator of the Economic Development Administration of the City, at p 4. Previous to the Penn Central proposal, lighterage service was included in the freight rate. See generally Lighterage Cases, 203 I.C.C. 481 (1934)
 
 
 [3]
 Investigation and Suspension (I. & S.) Docket No. 8645, Order (June 29, 1971)
 
 
 [4]
 We could first address ourselves to the issue of whether plaintiffs have standing to sue, since one of the tests to determine standing is whether judicial review has been precluded by statute, and thus the standing issue and the jurisdictional issue merge. See Barlow v. Collins, 397 U.S. 159, 165, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 156, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). However, addressing the standing question first would unnecessarily involve us in discussion of the other two tests of standing, namely, whether plaintiffs have a stake and interest in the June 28 order to impart the concrete adverseness required by Article III, and whether the plaintiffs are within the zone of interests protected by the Interstate Commerce Act. See Barlow, supra, 397 U.S. at 164, 90 S.Ct. 832; Camp, supra, 397 U.S. at 152, 157, 90 S.Ct. 827
 
 
 [5]
 The proposed increases were $15.08 per ton on domestic traffic and $11.88 per ton on waterborne (export, import, coastwise and intercoastal) traffic
 
 
 [6]
 I. & S. Docket No. 8645, Order (May 27, 1971). The authority for such a suspension is section 15(7) of the Interstate Commerce Act, 49 U.S.C. Sec. 15(7) (1970)
 
 
 [7]
 Pursuant to Rule 200(b) of the ICC's General Rules of Practice, 49 C.F.R. Sec. 1100.200(b) (1971)
 
 
 [8]
 I. & S. Docket No. 8645, Order (June 29, 1971)
 
 
 [9]
 Also pursuant to Rule 200(b), note 7, supra
 
 
 [10]
 I. & S. Docket No. 8645, Order (July 7, 1971)
 
 
 [11]
 I. & S. Docket No. 8645, Order (July 29, 1971)
 
 
 [12]
 Brief for Appellant Port Authority at 18. The proposition is unassailable. See Oscar Mayer & Co. v. United States, 268 F.Supp. 977, 981 (W.D.Wisc.1967); Luckenbach Steamship Co. v. United States, 179 F.Supp. 605, 609 (D.Del.1959), vacated as moot, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). Cf. Arrow Transp. Co. v. Southern Ry. Co., 372 U.S. 658, 670, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); Board of Railroad Comm'rs of State of North Dakota v. Great N. Ry. Co., 281 U.S. 412, 429, 50 S.Ct. 391, 74 L.Ed. 936 (1930)
 
 
 [13]
 "Our view is * * * that once the Commission has in the exercise of its discretion decided to suspend it must proceed thereafter without arbitrariness, capriciousness and illegality." Brief for Appellant Port Authority at 18
 
 
 [14]
 See generally Brooks & Daily, The Commission's Power of Suspension and Judicial Review Thereof, 27 ICC Prac.J. 589 (1960)
 
 
 [15]
 See Rule 200(a) of the Commission's General Rules of Practice, 49 C.F.R. Sec. 1100.200(a) (1971); Arrow Transp. Co. v. Southern Ry. Co., 372 U.S. 658, 671-672, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963)
 
 
 [16]
 The language is: "* * * upon consideration of the said schedule and protests thereto there is reason to believe that they would, if permitted to become effective, result in rates and charges, * * * which would be unjust and unreasonable in violation of the Interstate Commerce Act." See, e. g., I. & S. Docket No. 8645, Order (May 27, 1971); Oscar Mayer & Co. v. United States, 268 F.Supp. 977, 979 n. 3 (W.D.Wisc.1967); Long Island R.R. Co. v. United States, 140 F.Supp. 823, 826 (E.D.N.Y.1956); Amarillo-Borger Express, Inc. v. United States, 138 F.Supp. 411, 414 (N.D.Tex.1956), vacated as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598 (1957)
 
 
 [17]
 "And it further appearing, That there is an immediate need for some increase in revenue to enable the respondent carrier to maintain the involved service * * *." I. & S. Docket No. 8645, Order (June 29, 1971)
 
 
 [18]
 See similar thoughts by Judge Swan in Freeport Sulphur Co. v. United States, 199 F.Supp. 913, 916 (S.D.N.Y.1961), and Judge Friendly in Long Island R.R. Co. v. United States, 193 F.Supp. 795, 798 (E.D.N.Y.1961)
 
 
 [19]
 "In its Annual Reports for the three years before 1910 the Commission had directed attention to the fact that such courts as entertained jurisdiction were reaching diverse results, which engendered confusion and produced competitive inequities. The large expense entailed in prosecuting an action and financing a substantial bond proved prohibitive for many small shippers of modest means. Even when a large shipper secured an injunction, the scope of its relief often protected only that particular shipper, leaving his weaker competitors at the mercy of the new rate. * * * As an equally serious consequence, the regulatory goal of uniformity was jeopardized by the diverse conclusions reached by different District Courts-even, it appears, as to the reasonableness of a particular rate change. This resulted in disparity of treatment as between different shippers, carriers, and sections of the country, causing in turn 'discrimination and hardship to the general public."' Arrow Transp. Co. v. Southern Ry. Co., 372 U.S. 658, 663-664, 83 S.Ct. 984, 987, 10 L.Ed.2d 52 (1963) (footnote and citation omitted)
 
 
 [20]
 "A court's disposition of an application for injunctive relief would seem to require at least some consideration of the applicant's claim that the carrier's proposed rates are unreasonable. But such consideration would create the hazard of forbidden judicial intrusion into the administrative domain. Judicial cognizance of reasonableness of rates has been limited to carefully defined statutory avenues of review. These considerations explain why courts consistently decline to suspend rates when the Commission has refused to do so, or to set aside an interim suspension order of the Commission." Id. at 669-670, 83 S.Ct. at 990 (footnotes omitted). See generally 3 K. Davis, Administrative Law Sec. 19.01 (1958 and 1970 Supp.)
 Even in the face of Arrow's prohibition on premature reviews of claims that rates are or are not reasonable, appellants invite us to engage in just such a review: "The June 28 order permitting interim rates was not supported by substantial evidence before the ICC. There was no indication that the interim charges would produce a sufficient 'increase in revenue to enable the respondent carrier to maintain the involved service; * * *' Rather, the protestants contended, without dispute from Penn Central * * * that such charges would divert virtually all freight from lighters to other Ports or to motor trucks * * *. The interim charges would neither produce increased revenues nor help maintain the service. Since the ICC order cannot be sustained on the grounds advanced, it must be vacated." Brief for Appellant City at 10-11 (citations omitted).
 
 
 [21]
 Compare Long Island R.R. Co. v. United States, 140 F.Supp. 823 (E.D.N.Y.1956) (Swan, C. J., dissenting) and Amarillo-Borger Express, Inc. v. United States, 138 F.Supp. 411 (N.D.Tex.1956), vacated as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598 (1957) (both holding that vacation orders are reviewable) with Freeport Sulphur Co. v. United States, 199 F.Supp. 913 (S.D.N.Y.1961) (holding that vacation orders are not reviewable). A clearly intermediate position was adopted in Long Island R.R. Co. v. United States, 193 F.Supp. 795 (E.D.N.Y.1961) and followed in Naph-Sol Refining Co. v. United States, 269 F.Supp. 530 (W.D.Mich.1967) to the effect that appellate decisions of the Commission reversing decisions of the Suspension Board are reviewable only in cases of clear abuse. The Freeport court apparently reserved decision on this position. See 199 F.Supp. at 916
 Appellants attempt to distinguish Freeport and the recent Oscar Mayer case (see note 22 infra) from the cases that support their position by arguing that the former involved orders vacating Suspension Board orders while here the appellate division denied Penn Central's petition for vacation. Brief for Appellant Port Authority at 15; Brief for Appellant City at 8. The distinction is without substance. The reasons for insulating vacation orders apply with equal force to denial-modification orders. See text accompanying notes 18-20 supra.
 
 
 [22]
 Accord, Oscar Mayer & Co. v. United States, 268 F.Supp. 977, 980 (W.D.Wisc.1967)
 
 
 [23]
 The issue in Arrow was whether a district court is precluded by section 15(7) of the Interstate Commerce Act from issuing an injunction extending the seven month statutory period during which the effective date of proposed tariffs can be suspended
 
 
 [24]
 372 U.S. at 667-668, 83 S.Ct. at 988 (footnotes omitted)
 
 
 [25]
 42 U.S.C. Sec. 4332(2) (C) (1970)
 
 
 [26]
 The Act itself requires all federal agencies to prepare a detailed statement on all major federal actions significantly affecting the quality of the human environment, such statement to analyze (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented, (3) alternatives to the proposed action, (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Moreover, the Act requires the agency to consult with and obtain the comments of any federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. NEPA Sec. 102(2) (C), 42 U.S.C. Sec. 4332(2) (C) (1970)
 In explaining the purpose of section 102, the managers on the part of the House in the conference report on NEPA said: "* * * it is the intent of the conferees that the provision 'to the fullest extent posible' shall not be used by any Federal agency as a means of avoiding compliance wtih the directives set out in section 102. Rather, the language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorizations * * *." 2 U.S.Code Cong. & Admin. News, pp. 2767, 2770 (1969). See generally Peterson, An Analysis of Title I of the National Environmental Policy Act of 1969, 1 ELI Envir.L.Rep. 50035 (1971).
 The President's Executive Order requires federal agencies to "[d]evelop procedures to ensure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties. These procedures shall include, whenever appropriate, provision for public hearings * * *." Exec.Order No. 11514, 3 C.F.R. 104, 105 (Supp.1971). See further the detailed suggestions as to the contents of an environmental impact statement in the Council on Environmental Quality's Statements on Proposed Federal Actions Affecting the Environment, 36 Fed.Reg. 7724 (1971).
 On the necessity for a careful and detailed balancing analysis, see also Calvert Cliffs' Coordinating Comm., Inc. v. United States AEC, 449 F.2d 1109, at 1118 (D.C.Cir.1971); Zabel v. Tabb, 430 F.2d 199, 213 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971); Peterson, supra, at 50038-39.
 
 
 [27]
 Calvert Cliffs' Coordinating Comm., Inc. v. United States AEC, 449 F.2d 1109 (D.C.Cir., 1971)
 
 
 [28]
 Id. at 1123. Because this case does not call for it, we gladly pass over a discussion of the difficult if not insoluble problem of how one defines and then quantifies the costs referred to in text
 
 
 [29]
 That there are environmental reasons for maintaining the economic health of railroads is an argument to which the Commission has turned an attentive ear: "* * * it would be dangerously improvident to ignore the implications of overreliance upon highways and the vehicles using them. The undesirable effects of our national, regional, and local road-building programs in the areas of land use, taxation, scenic pleasure, air cleanliness, and safety are all to familiar to most Americans today
 "It [America] is faced with the question whether to multiply its highway facilities and its highway problems to the exclusion of other available resources for surface passenger movement, or to restudy and improve the entire pattern of all such resources, including highway and rail.
 "* * * it is clear to us that many passenger operations in this country are essential and should be preserved." New York, New Haven & Hartford R.R. Co., 327 I.C.C. 151, 159, 160, 162 (1966).
 
 
 [30]
 The Commission has proposed regulations that specify the procedures to insure that "a detailed environmental statement will be made when the regulatory action taken by us under the applicable statute will have * * * a significant environmental impact." ICC, Notice of Proposed Rule Making, Implementation of National Environmental Policy, 36 Fed.Reg. 10807, 10809 (1971). The Commission assured us during oral argument that it will carefully consider the environmental impact of Penn Central's proposed tariffs in the investigation now proceeding