**REFRIGERATED TRANSPORT CO., INC., et al., Plaintiffs,**

Colonial Refrigerated Transportation, Inc., et al., Intervening Plaintiffs,

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

National Independent Truckers Unity Committee et al., Intervening Defendants.

**No. C74–1674A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 5, 1975.

Order April 14, 1975.

Charles W. Singer, Singer, Sullivan & Smyth, Chicago, Ill., and Ft. Lauderdale, Fla., Alan E. Serby and Bruce E. Mitchell, Serby & Mitchell, Atlanta, Ga., for plaintiffs.

Ames, Hill & Ames, Washington, D. C., James E. Wilson, Jon F. Hollengreen, Washington, D. C., representing Carrier Conference—Irregular Route, for intervening plaintiffs.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., John W. Stokes, Jr., U. S. Atty., N. D. Ga., Atlanta, Ga., for United States.

Richard H. Streeter, Atty., Fritz R. Kahn, Gen. Counsel, I. C. C., Washington, D. C., for I. C. C.

Israel Packel, Atty. Gen., Gordon P. MacDougall, Sp. Asst. Atty. Gen., Harrisburg, Pa., for Commonwealth of Pennsylvania.

Paul D. Boas, James H. Logan, Pittsburgh, Pa., for National Independent Truckers Unity Committee.

Before BELL, Circuit Judge, and HENDERSON and MOYE, District Judges.

## ORDER

MOYE, District Judge.

This is an action to review, enjoin, and set aside orders of the Interstate Commerce Commission [ICC] in Ex Parte No. MC–92, "Investigation of Impact of Rising Costs on Motor Common Carriers," served July 10, 1974, and supplemental orders served July 18, July 26, August 7 and August 22, 1974.

Jurisdiction of this three-judge court is invoked pursuant to 49 U.S.C. § 305 (g) and 28 U.S.C. §§ 1336, 2321, 2284 and 2325. Venue is laid in this district pursuant to 28 U.S.C. § 1398(b). The United States is sued as a necessary party pursuant to 28 U.S.C. § 2322.

The plaintiffs are motor common carriers who lease trucks and sometimes drivers from "owner-operators" [independent truckers]. The defendants Interstate Commerce Commission and the United States have been joined by the National Independent Truckers Unity Committee [NITUC] and the Commonwealth of Pennsylvania. NITUC is the principal organization of independent truck drivers in the United States operating under ICC authority. Pennsylvania was the site of much of the trucker stoppages during the truckers' strike last winter. Both intervening defendants were parties in interest in the proceeding before the ICC.

The plaintiff carriers have exhausted their administrative remedies before the Commission. Plaintiffs' motion for a temporary restraining order against the ICC was denied on August 22, 1974, by Charles A. Moye, Jr., United States District Judge, on the basis of representations by the Commission that issuance thereof would result in a national emergency, caused by a possible nationwide truckers' strike. That proceeding became the basis for the instant one which was heard before this three-judge district court on October 10, 1974.

The orders in Ex Parte No. MC–92, which plaintiffs are challenging, cancelled the 6 percent fuel surcharge allowed by the ICC in February 1974 to motor carrier companies and "passed through" to owner-operators. The fuel surcharge was part of the settlement of the nationwide truckers' strike resulting from the fuel crisis of last winter. In lieu of the surcharge, the motor carriers were directed to file for increases in rates as they could justify them. Following its investigation into rising fuel costs in MC–92, begun April 4, 1974, and completed July 10, 1974, the ICC had found that fuel costs had actually risen an average of 3.09 percent, not 6 percent as had been estimated in February 1974. The ICC, in its order of August 7, 1974, after cancelling the fuel surcharge, finally fixed a formula for compensa-

tion of owner-operators by the carriers at the following:

> "*It is further ordered,* That the compensation due owner-operators upon voluntary cancellation of the surcharge or upon termination of the surcharge by order of the Commission be, and it is hereby, to be computed in the following manner:

>> 3.09 percent of the old base rate (rate in effect July 8, 1974) plus the owner-operators' share of the revenues derived from the new rates after a reduction in dollar amount equal to the above 3.09 percent. (See method outlined in 'Case 2' in the second further appearing paragraph).

> "*It is further ordered,* That, consistent with the intent expressed in the report and supplemental orders herein, no owner-operator shall receive less, in terms of an actual dollar amount, than he received from the certificated carrier during the period the fuel surcharge was in effect."

It is the latter part of this order, providing that, under the new formula, "no owner-operator shall receive less, in terms of actual dollar amount, than he received from the certificated carrier during the period that the fuel surcharge was in effect," which forms the crux of the plaintiffs' complaint.

Concerning the promulgation of this provision, the plaintiffs allege the following:

(1) The order deprived the plaintiffs of administrative due process contrary to the Administrative Procedure Act;

(2) The order is unsupported by substantial evidence in the proceedings and essential findings of fact;

(3) The ICC acted outside its jurisdiction in setting the compensation between motor carriers and owner-operators;

(4) The order is arbitrary, capricious and unreasonable in numerous particulars;

(5) The order is contrary to National Transportation Policy as set forth in the Interstate Commerce Act.

The defendant claims that the Court is without jurisdiction to review Ex Parte No. MC–92 because it was promulgated under the general tariff suspension power of the ICC. In the alternative, the ICC denies that plaintiffs were denied administrative due process under the Administrative Procedure Act or that the order is unsupported by substantial evidence in the proceedings and essential findings of fact. The ICC claims that it acted within its jurisdiction in promulgating MC–92, setting the compensation between motor carriers and owner-operators. The ICC states that MC–92 is important in its implementation of National Transportation Policy, as set forth in the Interstate Commerce Act, and is not arbitrary, capricious or unreasonable in its numerous particulars.

The threshold issue before this three-judge court concerns its jurisdiction to review this action by the ICC. The question is whether the ICC's action in No. MC–92 is part of the tariff suspension process, 49 U.S.C. § 316(g), and therefore insulated from judicial review by this court. Port of New York Authority v. United States, 451 F.2d 783 (2d Cir. 1971).

The ICC argues that the tariff suspension process was invoked in the following manner: Once the 6 percent surcharge was ordered cancelled, the ICC anticipated that carriers would propose rate increases to cover lost fuel surcharge revenues and the ICC anticipated investigating and suspending the new rates for seven months, under 49 U.S.C. § 316(g). Ex Parte No. MC–92, however, substituted the 3.09 percent formula for the various individual orders which were to be entered in the individual investigation and suspension proceedings in exchange for a commitment by the ICC not to investigate and suspend the new rates filed by the carriers. In other words, as the ICC explains:

> "Here, the Commission's orders, on a broad scale, establish and clarify conditions that would otherwise be imposed in individual suspension orders to be issued as the carriers cancelled

the surcharge and replaced it with a proposed rate increase. In short, all common carriers through these orders are being offered an alternative to suspension and investigation of their rates by being given advance notice of what they will have to show in order to obtain the sought-after increases. Since these orders simply anticipate the orders that would otherwise be entered in the various, individual investigation and suspension proceedings, they, like the suspension orders which they replace, are not subject to judicial review."

Put succinctly, the ICC urges that its suspension of the suspension process, on condition that the carriers accept the MC–92 formula, is part of the suspension process and therefore judicially unreviewable.

The plaintiffs urge that MC–92 is not, and never was, a tariff-suspension proceeding under 49 U.S.C. § 316(g). It originated as an "investigation" into fuel costs and terminated in a rule-making proceeding by the July and August 1974 orders, creating a permanent "pass-through" of 3.09 percent to the owner-operators. As a rule-making proceeding under § 551(4) of the Administrative Procedure Act, the ICC was obligated to follow the "notice" and other procedural requirements mandated by the Administrative Procedure Act. Its failure to do so is therefore judicially reviewable by the Courts.

The ICC cites Port of New York Authority v. United States, *supra*, as the leading case on non-reviewability of ICC orders vacating suspension orders, 451 F.2d at 787–788, and cases cited therein. However, the *Port of New York Authority* case is inapposite to the instant case. In *Port of New York Authority*, the ICC's Suspension Board reversed its earlier decision to suspend the effective date of tariffs proposed by a (rail) carrier. In the instant case, the plaintiff carriers had not yet filed their tariffs before the ICC. Rather, the ICC, anticipating such filings, "suspended" them on condition that a 3.09 percent "pass-through" be given to owner-operators, not to be less money in dollars than the owner-operators received under the 6 percent fuel surcharge. This is hardly a fair description of the "investigation and suspension process" provided for by § 316(g):

"New rates; determination of fairness by Commission; suspension

"(g) Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, charge, or classification for the transportation of passengers or property by a common carrier or carriers by motor vehicle, or by any such carrier or carriers in conjunction with a common carrier or carriers by railroad and/or express and/or water in interstate or foreign commerce, or any rule, regulation, or practice affecting such rate, fare, or charge, or the value of the service thereunder, the Commission is authorized and empowered upon complaint of any interested party or upon its own initiative at once and, if it so orders, without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, or charge, or such rule, regulation, or practice, and pending such hearing and the decision thereon the Commission, by filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, or charge, or such rule, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after hearing, whether completed before or after the rate, fare, charge, classification, rule, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding instituted after it had become effective. If the proceeding has not been concluded and an order made within the period of

suspension, the proposed change of rate, fare, or charge, or classification, rule, regulation, or practice, shall go into effect at the end of such period: *Provided*, That this subsection shall not apply to any initial schedule or schedules filed on or before July 31, 1938, by any such carrier in bona fide operation on October 1, 1935. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable."

We think that the action of the ICC in Ex Parte No. MC–92 was not a "suspension proceeding" at all. Rather it seems to have developed into a rule-making proceeding, as plaintiffs allege, and was seriously deficient in affording the plaintiffs and others the administrative due process provided for by the Administrative Procedure Act.

Accordingly, we rule that we have jurisdiction to review this action of the ICC.

Rule-making procedures by the ICC are governed by 5 U.S.C. § 553.

Section 553 provides:

.    .    .    .    .    .

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

"(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

"(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

"(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 383."

The ICC contends that the publishing of Ex Parte No. MC–92 "Investigation of Impact of Rising Costs on Motor Common Carriers" served April 4, 1974, in the Federal Register, 39 Fed.Reg. 13221, gave adequate notice to the carriers that the 6 percent surcharge would be cancelled, and that a formula providing that "no owner-operator shall receive less, in

terms of an actual dollar amount, than he received from the certificated carrier during the period the fuel surcharge was in effect" was contemplated. This alleged "notice" is to be found in the language of the order stating that:

"*It further appearing* . . . that in accordance with the statement in the order in Special Permission No. 74–2525 that—

The Commission shall analyze the impact of fuel expenses on a month-to-month basis to determine whether there is justification for increasing or reducing the surcharge authorized by this order; if conditions warrant, this order will be amended accordingly.

—the Commission should, in the investigation hereby instituted, which is related thereto, review the respective relationships of the increased fuel costs to the surcharges, filed under the authority of No. 74–2525, insofar as they are applicable to (1) the ratemaking carriers' "owned operations" (i. e., in providing transportation with the carriers' owned vehicles and their own drivers), and (2) those operations performed by owner-operators; and that the Commission should consider the impact of the relationship in (1) above in determining the general revenue needs of the motor common carrier industry as indicated by revenue need data relating to the so-called ratemaking carriers. . . ."

The Commission claims that it would be illogical to assume that the Commission, in determining the "impact of possible escalating cost and changing traffic volume on the revenue needs of the motor common carrier industry generally" would ignore the owner-operators' continuing needs vis-a-vis the motor carriers, especially if it were to be shown by the facts uncovered by the investigation that those needs would have an effect on the carriers' revenue needs. Therefore, the ICC claims, the order reducing the fuel surcharge passthrough to the owner-operators to 3.09

percent, but preserving the independent operators' revenues at previous dollar amounts under the surcharge was forecast by the ICC's order of April 4, 1974.

The April 4, 1974, order named 200 carriers in the investigation, only one of which was one of the plaintiff carriers. On June 20, 1974, these 200 carriers were directed to furnish requested data to the ICC by July 15, 1974. The ICC's report of the investigation was served July 11, 1974. It provided, *inter alia*,

"(2) that no owner operator shall receive less compensation for fuel than he formerly received from the certificated carrier [under the 6 percent surcharge]."

This was restated by the Commission in a clarifying order served July 18, 1974:

"That no owner-operator shall receive less compensation for fuel than he was formerly receiving from the certificated carrier under the surcharge. . . ."

A second clarifying order served July 26, 1974, specified the method of computation to owner-operators upon cancellation of the surcharge as the following:

"Six percent (6%) . . . of the old base rate (rate in effect July 8, 1974) plus the owner-operators' share of the revenues derived from the new rates after a reduction in dollar amount equal to the above 6 percent. . . ."

A third clarifying order served August 7, 1974, substituted 3.09 percent for 6 percent in the July 26, 1974, order and added the challenged proviso that

"no owner-operator shall receive less, in terms of an actual dollar amount, than he received from the certificated carrier during the period the fuel surcharge was in effect."

The net effect of this provision, as best the Court can determine after reading the pleadings, briefs, affida-

vits and hearing oral argument on the matter is that, in order to guarantee the owner-operators' receipt of the same amount of compensation in dollars as received under the 6 percent fuel surcharge, the carriers must pay the difference between the old rate and the new (lower) rate out of their own pockets.

■■ Nowhere in any of the orders in the proceeding below, is there articulated a factual basis or rationale for preserving the revenues of the owner-operators *at the expense of the carriers,* upon cancellation of the surcharge. A rule-making proceeding of this sort under § 204(a)(6) of the Motor Carrier Act does not require a hearing, formal findings of fact and conclusions of law, 49 U.S.C. § 304(a)(6), American Trucking Associations v. United States, 101 F.Supp. 710, 724 (N.D.Ala.1951), aff'd, 344 U.S. 298, at 318–20, 73 S.Ct. 307, 97 L.Ed. 337 (1953). However, where the Commission is acting in a quasi-legislative capacity in promulgating a rule like the one in question,

"we are instructed by the provisions of Section 10 of the Administrative Procedure Act, Title 5 U.S.C.A. [§§ 701–706], that we may review its actions to determine whether the rules: (1) Are arbitrary, capricious or an abuse of discretion; or (2) Contrary to Constitutional rights, power, privilege or immunity; or (3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or (4) Were formulated without observance of procedure required by law." American Trucking Associations v. United States, 101 F.Supp. at 724.

While the Commission's investigation in MC–92 into the impact of rising costs on motor common carriers may have been sufficient to provide the requisite data, information and rational basis for the cancellation of the 6 percent fuel surcharge and the replacement of it with a different surcharge more accurately reflecting the true rise in the cost of fuel, there is not a shred of evidence, data or reasoning in the ICC orders below to substantiate the placement of a compensation floor under the owner-operators giving them in dollar amount, the same money under the new formula as under the old surcharge. This is no way for the Commission to operate.

Under this Court's powers of review under 5 U.S.C. § 706(2)(A), we find the ICC's action to be arbitrary and capricious. Greyhound Corporation v. United States, 221 F.Supp. 440 (N.D.Ill. 1963).

In summary, the Court, after reading voluminous briefs and hearing lengthy argument, finds that the ICC gave no notice of the challenged rule promulgation in the instant proceeding. It articulated neither a factual basis nor a rationale for the second provision of the ICC order of August 7, 1974, requiring that "no owner-operator shall receive less, in terms of an actual dollar amount, than he received from the certificated carrier during the period the fuel surcharge was in effect."

Accordingly, the case is ordered remanded to the ICC for further findings and proceedings not inconsistent with this Court's order. The ICC shall conclude such findings and proceedings and report back within sixty (60) days. This order is made without prejudice to the right of the carriers to seek a temporary restraining order if the ICC does not report back within the time period allotted.

So ordered.

## ORDER

PER CURIAM:

Pursuant to this Court's order of February 5, 1975, the defendants have reported back to the Court and state that the Interstate Commerce Commission vacated its challenged order in Ex Parte No. MC–92 on April 4, 1975, and discontinued the proceedings.

The Interstate Commerce Commission's order in so doing recited the following:

"*It appearing,* That the United States District Court for the North-

852

ern District of Georgia has determined that the requirement that 'no owner-operator shall receive less, in terms of an actual dollar amount, than he received from the certificated carrier during the period the fuel surcharge was in effect is without support in the record and the previous orders of this Commission;

"*And it further appearing,* That responsive to the Court's direction, the Commission has reviewed the record in light of the Court's opinion and has concluded that the above quoted requirement should be vacated and that, in addition, no useful purpose would be served by continuing in effect the related portion of the provision pertaining to computation of compensation due owner-operators."

Inasmuch as the challenged order in Ex Parte No. MC–92 has been vacated, this action by plaintiffs to review, enjoin and set aside the Interstate Commerce Commission's order is now moot. Accordingly, the Court orders the case dismissed for mootness.