**ALABAMA HOME HEALTH CARE, INC., Plaintiff,**

v.

**Richard S. SCHWEIKER, as Secretary of Health and Human Services, Defendant.**

Civ. A. No. 81-C-1583-S.

United States District Court, N. D. Alabama, S. D.

Dec. 1, 1981.

Joe R. Whatley, Stewart, Falkenberry & Whatley, Birmingham, Ala., for plaintiff.

Frank W. Donaldson U. S. Atty., Herbert J. Lewis, III, Asst. U. S. Atty., Birmingham, Ala., for defendant.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

### Issues Presented

Congress has provided for judicial review of decisions of Secretary of the Department of Health and Human Services (HHS) regarding reimbursement to Medicare providers after a final decision by the HHS Secretary. 42 U.S.C. § 1395oo. The first issue with which this Court must grapple is whether it has jurisdiction to grant interim injunctive relief so as to maintain the *status quo* pending a final decision by the Secretary on a provider reimbursement claim. If such jurisdiction exists, then the Court must determine whether plaintiff, Alabama Home Health Care, Inc., has satisfied the requirements for such interim relief. For the reasons discussed in this opinion, the Court concludes that it is amply possessed of the requisite jurisdiction; and that plaintiff has shown its entitlement to a preliminary injunction pending a final decision by the Secretary.

### FINDINGS OF FACT

#### Organization of Alacare

Alabama Home Health Care, Inc. ("Alacare") is a not-for-profit corporation organized in the early seventies under the laws of Alabama. Alacare was organized by Charles D. Beard, Jr., his wife, Mary Sue Beard, and his brother, Robert L. Beard. Charles and Mary Sue Beard have three sons—John G., Charles, III, and William G.,—and two daughters—Margaret Susan, and Susan Ann.

During the first several years of its existence, Alacare was managed by its president, Robert L. Beard, who devoted all of his time to the business. Charles Beard, Jr. was the executive vice-president, and roughly twenty percent of his time was devoted to the business. Mary Sue Beard was Alacare's Secretary-Treasurer—drawing a modest salary as only five percent of her time was consumed by the business. During these years, William G. and Charles III worked on a parttime basis for Alacare while they pursued their undergraduate and professional studies.

In 1976, Robert Beard left Alacare; and for several months thereafter, Charles Beard, Jr. assumed the presidency of the corporation. He convinced his son John Beard to take the job. Before assuming this position, John divested himself of his interest in Health Systems Medical Supply (for no consideration, since the stock had no value) and Professional Services Leasing Corporation (for $8,000.00). John Beard has been president and General Manager of Alacare ever since; Charles Beard, Jr. and Mary Sue Beard have resumed and remained in their original positions with the corporation.

*Business Interests of Charles Beard, Jr.*

Charles Beard, Jr. has several business interests. He is the sole owner and president of Trinidad Petroleum, Inc., an Alabama corporation whose assets are apparently substantial. He also owns ninety-four percent (94%) of the stock and is president of Med-A-Par, Inc. Within the past five years, he set up a family partnership, E&T Realty, for the purpose of buying a building which would house his various business interests. Through Trinidad Petroleum, he owns a one-half interest in E&T Realty; each of his children has a one-tenth (.1) interest in this company.

*Health Services Medical Supply*

Health Services Medical Supply, Inc. (HSMS) was incorporated in July, 1975, by the three sons of Charles Beard, Jr. Charles, III is the president of this corporation. HSMS sells medical supplies and rents durable medical equipment; and one of its principal customers is the plaintiff Alacare. However, since 1978 between 55% and 60% of HSMS's business has been transacted with customers other than Alacare—including Mid-South Home Health Care Center, Spain Rehabilitation Center, and Lakeshore Hospital.

HSMS has 50,000 authorized shares of stock; 5,000 of which are voting shares. The voting shares are held by the following persons in the amount indicated:

| | |
|---|---|
| Charles D. Beard, III | 875 |
| William G. Beard | 875 |
| Mrs. Johnny G. Kessler | 1,625 |
| Mrs. Doris Jean Graham | 1,625 |

Non-voting stock is held by Professional Services Leasing, Inc. (34,115 shares) and Trinidad Petroleum (3,700 shares). The balance of the authorized shares is held as treasury stock.

Charles Beard, Jr., through Trinidad Petroleum at times and at other times directly, has made several loans to HSMS upon the request of Charles, III. Between October, 1975, and April, 1977, Charles, Jr. loaned his son and namesake some $18,-674.00 for use by HSMS. These loans have all been repaid in full—the last payment having been made on April 17, 1981. In addition, Charles Beard, Jr., through Trinidad Petroleum, owns 3,700 of the non-voting shares of HSMS.[1]

HSMS was a response by Charles, III to problems being encountered by his father in the operation of Alacare. Prior to the organization of HSMS, Alacare had rented durable medical equipment from a company whose services were highly unsatisfactory. Charles Beard, Jr., expressed his dissatisfaction with the quality, or lack of it, of this service on many occasions, but to no avail as the company felt that its services were the only one available. Charles, III, being aware of the problem, came to his father and sought his financial assistance in setting up a durable medical equipment corporation. While declining to definitely commit Alacare's business to the proposed new corporation, Charles, Jr. assured his son that if the proposed corporation offered competitive prices and quality service, it could reasonably expect Alacare's business.

In its first few years, HSMS depended heavily on Alacare for its business. Even so, HSMS offered no discounts to Alacare; and it sold supplies and rented equipment to Alacare at the same prices and rates as it charged its other customers. These charges are well within the prevailing rates in the Birmingham area.

Alacare's general policy and practice is to purchase its medical supplies and equipment at the least expensive prices. It has, on several occasions since the inception of HSMS, refused to purchase or lease various items from HSMS because it was able to obtain them elsewhere at less expensive prices.

Other than his 3,700 non-voting shares in HSMS, Charles Beard, Jr. has no equity in the corporation. He has never owned any voting stock of the corporation. He has never influenced or interfered in the affairs of the corporation; and the Court based on

---

1. Charles Beard, Jr. acquired these shares in exchange for a note given to him by Charles, III as security for a $3,700.00 loan made to HSMS for payment of taxes.

Charles, III's demeanor while testifying, doubts that Charles, Jr. has the power to influence the affairs of HSMS.

**Professional Services Leasing Corporation**

Professional Services Leasing Corporation (PSL) was organized as a business corporation under the laws of Alabama on April 12, 1974. Its incorporators, together with their respective shares, were as follows:

| | |
|---|---|
| John Beard | 98 shares |
| Johnnie Kessler | 1 share |
| Doris Graham | 1 share |

PSL was initially capitalized with $1,000.00; divided into 100 shares of capital stock with a par value of $10.00. Cash was paid in for the subscriptions to this capital stock.

John Beard, the first president of PSL, left it in 1976 to become president of Alacare. As stated earlier, he divested himself of his shares in PSL for a price of $8,000.00. Today, Mesdames Kessler and Graham each own 33% of the stock of PSL; and William Gary Beard owns the remaining 34% of its stock. William Gary acquired his interest in PSL in exchange for the "few thousands of dollars" owed to him by the corporation for previous services he rendered to the corporation. The evidence reasonably supports the inference that Mrs. Kessler and Mrs. Graham each paid John Beard $2,600.00 for the increase in their respective shares of PSL's stock.

Initially, PSL principally rented automobiles, trucks, and medical equipment. Today, it is an office products company—selling office supplies and leasing office equipment—primarily typewriters and desks.

In 1976, Alacare was the major customer of PSL—accounting for well more than half of its business. By 1978, approximately eighty percent (80%) of PSL's business was transacted with business organizations and/or persons other than Alacare. In the current year, Alacare accounts for only one and a half percent (1.5%) of PSL's business.

PSL's charges to Alacare are the same as its charges for similar items to other customers; and its prices compare favorably with those of other office suppliers in the highly competitive Birmingham market.

Charles Beard, Jr., through Trinidad, has loaned a total of not more than $5,000.00 over the past five years to William Gary for the use of PSL. These loans were secured by promissory notes; and they bear interest at the rate of twelve percent (12%).

PSL owns 34,115 of the non-voting shares of HSMS. William Gary used his personal savings and bonds to acquire this interest.

HSMS and Trinidad Petroleum respectively account for less than one half of one percent (.5%) of the annual business of PSL.

Based on the testimony of the witnesses, their demeanor and the facts recited herein, the Court doubts that Charles Beard, Jr. has the power, directly or indirectly, to control PSL.

### The Other Companies

Alacare readily concedes that E&T Realty, Trinidad Petroleum, and Med-A-Par are related organizations; and the books and records of these companies have been made available to the Secretary of his designees.

### The Scheme of Reimbursement

Alacare is a provider of "home health services," under the Medicare Act, to eligible individuals under the applicable provisions of the Social Security Act. 42 U.S.C. § 1395 et seq. The home health services covered by the Act and provided by Alacare include specified items and services furnished to an individual who is under the care of a physician. These items and services are provided on a visiting basis in an individual's home; they include part time or intermittent nursing care, medical supplies, physician therapy, occupational and speech therapy, medical social services, services of a home health aide, and other items and services specified in 42 U.S.C. § 1395x(m).

Under the Medicare program, home health agencies such as Alacare are reimbursed by the Secretary for the "actual" reasonable cost of services provided by them to Medicare beneficiaries. Since "reasonable cost" is defined as the cost actually

incurred, excluding any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, non-profit agencies such as Alacare make no profit by serving Medicare beneficiaries.

Virtually all of Alacare's patients are Medicare beneficiaries; and the corporation is almost entirely dependent upon reimbursement by the Medicare program to cover its costs of providing home health services.

Being a non-profit corporation, Alacare has no significant source of income other than Medicare reimbursements; it does not have earned profits or equity capital available to finance its operations or to pay current expenses.

Because of the four-week period required to reimburse Alacare based on its interim cost reports, accounts receivables form the most substantial portion of its assets. Generally, between $43,000 to $46,000 of plaintiff's assets exist in accounts receivable from Medicare. Any significant reduction in these accounts receivables would almost certainly result in Alacare's bankruptcy.

The primary duty of the Office of Direct Reimbursement ("ODR")—a branch of HHS—is the payment of funds to providers of medical services. ODR must therefore necessarily determine the amount of payment which adequately reflects the reasonable cost of services rendered to program beneficiaries. Since lump sum payments made long after services were rendered would effectively preclude participation by non-profit organizations such as Alacare, Congress mandated that interim payments be made to providers on a monthly basis, with subsequent adjustments for overpayments and underpayments. 42 U.S.C. §§ 1395g and 1395x(v)(1)(A)(ii); 42 C.F.R. § 405.402(b)(1), (2) and 42 C.F.R. 405.454. These interim payments are computed based on interim rates—which are established on the basis of quarterly and annual "cost reports" filed by the home health agency. In addition, each home health agency is required to file quarterly and annual cost reports, setting forth its actual costs incurred in providing services during

the reporting period. Quarterly adjustments are made to the interim rates, and appropriate adjustments are made annually to reconcile the total payment due to the agency for the year with the amount determined to be due based on the annual report. Insofar as practicable, interim rates should approximate actual costs, so that retroactive adjustments based on actual costs after the close of the fiscal year will be minimal. 42 C.F.R. § 405.454.

After receiving the annual cost report, the ODR analyzes it, undertakes any necessary audit, and furnishes the provider with a written notice of program reimbursement ("NPR") setting forth the ODR's determination of the total amount of reimbursement due under the program. 42 C.F.R. § 405.1803. Where a provider such as Alacare is dissatisfied with ODR's final determination and the amount in controversy is $10,000 or more, it may request a hearing before the Provider Reimbursement Review Board ("PRRB"); and judicial review in a federal district court thereafter. 42 U.S.C. § 1395oo; 42 C.F.R. §§ 405.1835 et seq.

Providers of home health care services are required to maintain and supply data to substantiate the costs claimed from Medicare. Reimbursement payments may not be made unless the provider "has furnished such information as the Secretary may request in order to determine the amounts due." 42 U.S.C. § 1395g(a) Providers therefore have the burden of proving that their claims for reimbursement are allowable.

*Related Organizations Regulations*

Pursuant to 42 C.F.R. § 405.427, where a provider of home health services is related to another organization "by common ownership or control,: then its cost basis for any transactions with the related organization may not exceed the cost to the related organization. This regulation is grounded in the recognition that

Where the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provid-

er, in effect the items are obtained from itself. 42 C.F.R. § 405.427(c)(2).

The regulation provides that "common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider." It further explains that "control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 405.427(b)(2), (3).

### Course of Dealings Between Alacare and The Secretary

For each fiscal years since 1975, Alacare's annual cost reports have reflected transactions with HSMS and PSL. These organizations were shown on its costs reports as "related organizations" by Alacare, out of an abundance of caution;[2] but Alacare has consistently explained to ODR that its directors and officers had neither ownership nor control of these organizations. For the fiscal year 1975, 1976, and 1977, the Secretary approved reimbursement to Alacare for payments made to HSMS (without adjustments) and PSL (with adjustments). These approved reimbursements were based on Alacare's records; the Secretary did not seek access to the records of either HSMS or PSL for those years. Rather than seeking the cost records of HSMS or PSL, the Secretary through his designated auditors conducted price surveys in the Birmingham market area and to the extent that the organizations' billings to Alacare for services and/or equipment were determined to be reasonable, they were approved without adjustment; where they were found to be unreasonable, they were appropriately adjusted. In effect, therefore, the Secretary has treated PSL and HSMS as though they were not related to Alacare, within the meaning of 42 C.F.R. § 405.427, for this three year period.

2. Unless shown on the report, Alacare might have exposed itself to criminal and civil liability because of the blood relationship of the owners

In June, 1979 an ODR official advised Alacare to reduce its business with PSL. Based on this advice, Alacare's business with PSL has been drastically reduced in each of the succeeding years:

| Year | Dollar Volume of Business with PSL |
|------|------------------------------------|
| 1978 | $26,000 |
| 1979 | 10,000 |
| 1980 | 5,400 |
| Jan-June 1981 | 1,700 |

In the same meeting, ODR officials assured Alacare that there would not be a problem with HSMS transactions, so long as its charges remained reasonable.

Alacare timely filed its annual cost reports for 1978 and 1979. Its 1980 cost report was filed a few weeks behind its usual date because ODR required the submission of cost data from related organizations. The cost data from Med-A-Par, Trinidad Petroleum Corporation and E&T Leasing was supplied to the Secretary pursuant to Alacare's request—there being no question but that these organizations are owned and controlled by Charles Beard, Jr.

In April, 1981, ODR conducted an on-site audit. The on-site auditors informed Alacare's president that ODR had instructed them not to undertake surveys of prevailing prices in the area, as had been done in the past. Instead, the Secretary took the position that PSL and HSMS were related organizations; and he insisted that Alacare produce their records.

Alacare made good faith requests of HSMS and PSL for their records; but they both insisted that they were not related organizations, and refused to produce the records requested by Alacare. ODR does not question Alacare's earnest effort to procure the requested records from PSL and HSMS. This is the first instance known to ODR in which an organization alleged to be related to a provider has failed to produce its cost records when requested to do so by the provider.

At the end of the audit, Alacare requested an exit conference, as provided by regu-

of HSMS and PSL and the board members and president of Alacare.

lations promulgated by the Secretary.[3] ODR never granted the exit conference. The Court further finds and concludes that such a conference would have been futile, since ODR had already determined that PSL and HSMS were related organizations; and nothing that Alacare would have presented at such a conference would likely have changed that determination.[4]

On August 26, 1981, ODR issued a Notice of Program Reimbursement ("NPR") to Alacare for the 1978 and 1979 fiscal years. The notice stated that Alacare had been overpaid by $107,619.00 in 1978—$105,-581.00 of which is attributable to transactions with allegedly related organizations, principally HSMS and PSL. Alacare was disallowed all costs arising from transactions with these organizations. In 1978, according to the notice, Alacare had been overpaid by $131,238.00; billings from allegedly related organizations accounted for $124,892.00 of this amount. For these years, ODR disallowed a total of $14,135.00 in executive compensation paid to Alacare's Director and Assistant Executive Director. While the record does not reflect the qualifications of its Assistant Executive Director, Alacare's Executive Director holds a law degree as well as a master's degree in business administration. In 1978, his salary was $18,000, in 1979, $26,000; and in 1980, $31,764.[5]

Less than ten days later, on September 4, 1981, ODR issued a notice of tentative settlement for the 1980 fiscal year. This notice was based on a desk review of Alacare's 1980 cost report; and it indicated an overpayment of $118,010.00.

**3.** "AUDIT PROGRAM
PART III—CONCLUSION
\*  \*  \*  \*  \*  \*
D.  Exit Conference
An exit conference should be arranged by the auditor with the administrator and/or financial executive of the home health agency. All changes listed on the "Audit Adjustment Report" should be discussed. ... If the home health agency officials and the auditor cannot agree to all the proposed changes, then [ODR] should be requested to participate in the conference to resolve the disagreement. (Medicare and Medicaid Guide, paragraph 7653 (emphasis added).)

ODR also disallowed Alacare's claim for the cost of rental space in 1980. ODR does not dispute that the amount claimed for rental represented the actual cost of the space to E&T Realty—an admittedly related organization; instead, it claims that the actual rental costs were unreasonable.

On September 8, 1981, ODR notified Alacare that its interim bi-monthly payments would be decreased from $21,747.00 to $17,-980.00; effectively reducing Alacare's monthly cash flow by $7,534.00.

Alacare almost immediately appealed the NPR's decision to the Provider Reimbursement Review Board; and filed this action seeking preservation of the *status quo* pending a final decision by PRRB.

The Court, after notice and hearing, granted Alacare's application for a temporary restraining order; and that order has remained in effect pending a decision by the Court of the motion for a preliminary injunction. At the preliminary injunction hearing, all parties agreed that the trial of this action be advanced and consolidated with the hearing, pursuant to F.R.C.P. 65(a)(2).

## THE COURT'S JURISDICTION

■ The Secretary vigorously argues that this Court is without jurisdiction over the subject matter of this action, citing *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and related decisions of the Fifth and other circuit courts of appeals.[6] These decisions general-

**4.** The Court's conclusion is based on the testimony of the Director of the Division of Provider Reimbursement, ODR, and the documentary materials supplied to ODR by Alacare after the audit.

**5.** Actually, the Director received only $19,000 in 1980. The difference was applied towards a prior overpayment to Alacare.

**6.** The Secretary cites *Dr. John T. McDonald Foundation v. Califano*, 571 F.2d 328 (5th Cir. 1978); *The American Association of Councils of Medical Staffs of Private Hospitals v. Califano*, 575 F.2d 1367 (5th Cir. 1978); *Association of American Medical Colleges v. Califano*, 569

ly stand for the now-settled legal principle that a federal district court lacks jurisdiction to review a decision by the Secretary prior to the exhaustion of administrative remedies—in this case, a final decision by the Secretary following the PRRB's determination. *Pacific Coast Medical Enterprises, supra,* succinctly summarizes the applicable principles and their rationale:

> * * * Congress has adopted a statutory scheme which provides one route for judicial review, exclusive of all others. It has determined that the Secretary and his delegated review procedure should have the opportunity to fully consider any Medicare benefit claims before they are submitted to a federal court. For the Medicare provider reimbursement claims, the designated avenue to judicial review is prescribed by 42 U.S.C. § 1395oo and requires appeal to the PRRB, with the Secretary having the opportunity to review the Board's decision prior to court action. The application of this requirement is not discretionary with the District Court—adherence to the procedures of 42 U.S.C. § 1395oo is a prerequisite to the Court's very jurisdiction. Even though the District Court may perceive equities in favor of hearing claims immediately, perhaps even the appearance of futility in forcing a party to pursue the statutory procedure, the District Court is utterly without power to entertain these claims.

But the Secretary's contention widely misses the mark. For Alacare does not, in this action, seek judicial review of the reimbursements determinations of ODR or the Secretary. Rather, it is steadfastly pursuing its statutorily-mandated administrative remedies as to these determinations, by prosecuting an appeal to the PRRB. It does not ask that this Court short-circuit that appeal.

Alacare seeks by this action only to maintain the *status quo* pending a final decision by the Secretary. It asserts, and the Court finds and concludes, that if its interim payments are reduced as sought by ODR in an effort to recover alleged overpayments for prior years, it will be irreparably harmed, i.e., forced out of business, during the time required to process its appeal to the PRRB.

Therefore, the real jurisdictional issue is whether, under a statute which provides for judicial review only after the exhaustion of administrative remedies, a federal district court is empowered to grant interim injunctive relief to preserve the *status quo* pending the exhaustion of such remedies. The authorities cited by the Secretary simply are inapposite to this issue.

In the Court's view, the issue is settled by 28 U.S.C. § 1651 (the All Writs Act) [7] and *FTC v. Dean Foods Co.,* 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1965). In *Dean,* the Supreme Court held that where federal courts are statutorily authorized to review final agency actions, the All Writs Act vests in such courts "the traditional power to issue injunctions to preserve the *status quo* while administrative proceedings are in progress" and thereby prevent impairment of the effective exercise of review jurisdiction. The Court cited *Arrow Transportation Co. v. Southern R. Co.,* 372 U.S. 658, 671, n. 22, 83 S.Ct. 984, 991, n. 22, 10 L.Ed.2d 52 (1963): "Such power has been deemed merely incidental to the court's jurisdiction to review final agency action. . . ." The holding in *Dean* was preceded by *Scripps-Howard Radio v. FCC,* 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed.2d 1229 (1942), in which the Supreme Court reached a similar conclusion.

Citing *Dean, supra,* the Fifth Circuit has noted:

F.2d 101 (D.C.Cir.1977); *Milo Community Hospital v. Weinberger,* 525 F.2d 144 (1st Cir. 1975); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 137–139 (9th Cir. 1980); and *Northlake Community Hospital v. United States,* 654 F.2d 1234 (7th Cir. 1981), in support of this contention.

7. The All Writs Act provides, in pertinent part:
   "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." (28 U.S.C. § 1651(a).)

A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established. When potential jurisdiction exists, a federal court may issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it. *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359, n. 19 (5th Cir. 1978).)

The Third Circuit recently reaffirmed this well-recognized power of federal courts in *Susquehanna Valley Alliance v. Three Mile Island*, 619 F.2d 231 (3rd Cir. 1980).

This Court, as well as others, has previously determined that federal district courts are empowered to grant preliminary injunctions preserving the *status quo*, pending appeal to the PRRB of cost determinations. *Home Health Care Agency of North Alabama v. Mathews*, No. 77–P–0017 (N.D.Ala., Feb. 1, 1977); accord, *Trico Home Health Services, Inc., v. Califano*, No. 78–4–Orl–Cir. R (M.D.Fla., January 25, 1978); *Greenwald and Friedman d/b/a Maple Leaf Nursing Home v. Whalen, Blum and Miller*, No. 78–Civ. 2765–CSH (S.D.N.Y., Jan. 26, 1979); *Home Health Services of Dade Co. v. Califano*, CV 79–109 (S.D.Fla.). There has been no subsequent change in the applicable law.

## STANDARDS FOR ISSUANCE OF PRELIMINARY INJUNCTION

Having concluded that it is authorized to entertain a motion for a preliminary injunction in the premises, the Court now turns to a consideration of whether Alacare has met the standards for the issuance of a preliminary injunction. These standards are: (1) a substantial probability that plaintiff will prevail on the merits, (2) irreparable injury to plaintiff in the absence of an injunction, (3) a greater injury to plaintiff in the denial of any injunction than harm to defendant in the granting of an injunction, and (4) a grant of a preliminary injunction will not disserve the public interest. *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430 (5th Cir. 1981); *Canal Authority v. Callaway*, 489 F.2d 567 (5th Cir. 1974).

### Likelihood of Success on the Merits

Alacare's burden is to show a substantial likelihood that at a trial on the merits, PSL and HSMS will either not be found to be related organizations or, in the event that they are found to be related, that its costs attributable to them do not exceed the actual and reasonable costs of the goods and services to the related organizations.

Under the facts as outlined earlier, there can be no question of common ownership. For Charles Beard, Jr. has no legal ownership of either PSL or HSMS. And while he has an equity interest in HSMS (represented by 3,700 nonvoting shares) and PSL (represented by promissory notes), the equity interest in these organizations cannot reasonably be said to be so substantial as to give him ownership of either corporation.

On the issue of common control, § 1004.3 of the *Provider Reimbursement Manual* states that:

"The term control includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive not its form or the mode of its exercise."

Charles Beard, Jr.'s equitable interest in the allegedly related organizations does not translate into control as a matter of law. See, e.g., Provider Appeal Decision ("Prov. App.Dec.") No. 00–75–10, Medicare and Medicaid Guide ("MMG") paragraph 27,375; Prov.App.Dec.No. 00–76–50, MMG paragraph 28,120; Prov.App.Dec.No. 53–78–1, MMG paragraph 29,723. The Court is convinced that neither Charles Beard III nor William Gary Beard would tolerate interference from his father in the conduct of his respective business. And should Charles Beard, Jr. threaten to curtail or withdraw Alacare's business from HSMS or PSL in an effort to control or direct its activities the Court was impressed that Charles III and William Gary would surrender Alacare's business rather than yield to such pressure.

The Court concludes that Alacare has satisfied its burden of establishing a substantial likelihood of prevailing on its claim that

HSMS and PSL are not related organizations. This conclusion is buttressed by the fact that in prior years, the Secretary has not treated the organizations as being related; and the relevant facts have not significantly changed since that time (except to the extent that Alacare accounts for an ever-decreasing percentage of HSMS and PSL's business).

### Irreparable Injury To Alacare

■ The uncontroverted evidence is that in the absence of an injunction, Alacare will be unable to meet its current obligations and it will be forced out of business by the Secretary's deductions from its interim payments—prior to a review by PRRB.

Under these circumstances, it is clear that plaintiff will suffer irreparable injury in the event that the Court denies the requested preliminary injunction.

### Balancing The Equities

■ The Secretary contends that should a preliminary injunction issue, it will be unable to recover some $405,000 in overpayments to Alacare. But if ODR properly interpreted the applicable law in approving Alacare's 1975–77 annual cost reports, the Government is not entitled to recover anything near that amount. And unless the Government is to be unjustly enriched—in derogation of equitable principles—it is not entitled to recover $405,000.00 even if ODR improperly approved the 1975–77 costs attributable to HSMS and PSL and its position is correct with respect to the 1978–80 cost reports. For the fact is that the Secretary does not deny that the services, supplies, and equipment were actually provided to Alacare; and it is certain that they were not gratuities. Alacare is at least entitled to the actual and reasonable costs to PSL and HSMS of these services, supplies and equipment.

Additionally, ODR always holds approximately $44,500.00 which is due and payable to Alacare.

Balancing the equities between the Secretary's need for immediate recoupment of alleged overpayments and Alacare's needs for continued, uninterrupted, and full interim payments, the scales are tilted heavily in favor of Alacare.

### The Public Interest

■ The public will not be disserved by the granting of a preliminary injunction in the premises. Among other things, the public has a vital interest in the survival of non-profit home health care agencies such as Alacare; and in the absence of an injunction, Alacare's demise is virtually assured.

### CONCLUSION

For the reasons set forth in this memorandum of opinion, the Court concludes that: (1) it has jurisdiction of this action to preserve the status quo pending the required exhaustion of administrative remedies, and (2) a preliminary injunction should issue.

A preliminary injunction embodying these conclusions shall issue separately.

### PRELIMINARY INJUNCTION

Based on the accompanying Memorandum of Opinion, and the Court expressly finding that: (1) it has jurisdiction of this action for preliminary injunctive relief to preserve the status quo pending a determination by the Provider Reimbursement Review Board of plaintiff's appeal; (2) there is a substantial likelihood that plaintiff will ultimately prevail on the merits of its claim for reimbursement of costs; (3) plaintiff will suffer irreparable harm if a preliminary injunction is not issued; (4) the defendant's injury, if any, to be occasioned by the issuance of the injunction is outweighed by the harm to plaintiff should the injunction be denied; and (5) the public interest will not be disserved by the issuance of a preliminary injunction; it is hereby ORDERED, ADJUDGED and DECREED as follows:

1. That upon posting of a security bond by the plaintiff in the amount of Five Thousand and 00/100 Dollars ($5,000.00), the defendant RICHARD S. SCHWEIKER, Secretary of the United States Department of Health and Human Services, be and he is hereby ENJOINED, for a period of one

year or such lesser time as may be required for the rendition of a decision by the Provider Reimbursement Review Board, from suspending or reducing future Medicare payments to plaintiff ALABAMA HOME HEALTH CARE, INC., as a means for recouping the $405,222.00 of alleged overpayments being contested by plaintiff before the Provider Reimbursement Review Board.

2. This preliminary injunction shall be binding on the defendant, his officers, agents, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of this order.